UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONNIE AVARAS, individually and as parent of A.A.,

Plaintiffs,

-against-

CLARKSTOWN CENTRAL SCHOOL DISTRICT,
BOARD OF EDUCATION FOR THE CLARKSTOWN
CENTRAL SCHOOL DISTRICT, and NEW YORK
STATE DEPARTMENT OF EDUCATION,

Defendants.

---

OPINION & ORDER

No. 15 Civ. 2042 (NSR)

NELSON S. ROMÁN, United States District Judge

Plaintiff Connie Avaras, individually and as parent of A.A., brings this action *pro se*

against the Clarkstown Central School District (the "District"), the Board of Education for the

District[1] (the "Board") (collectively the "District Defendants"), and the New York State

Department of Education (the "Department") pursuant to the Individuals with Disabilities

Education Improvement Act ("IDEA" or "IDEIA"), 20 U.S.C. § 1400 et seq., Title II of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, Section 504 of the

Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, and 42 U.S.C. § 1983 ("Section 1983").

Predominantly, Ms. Avaras seeks judicial review of a decision made by a State Review Officer

("SRO") at the Department, who affirmed the decision of an Independent Hearing Officer

("IHO"), denying Ms. Avaras's request for tuition reimbursement and other expenses associated

---

[1] The Clarkstown District Defendants have indicated that the Board of Education of the Clarkstown
Central School District was incorrectly named as the "New City Board of Education." The Clerk of the Court is
respectfully directed to amend the case caption accordingly, as reflected in this Opinion.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7|17|2017

with a private school placement after finding that the District offered A.A. a free and appropriate public education for the 2012-2013 school year and that, although the District did not offer such an education for the 2013-2014 school year, her unilateral alternative placement for A.A. was also inadequate. Plaintiff also alleges the Defendants' treatment of A.A. and herself violated the ADA, RA, and Section 1983.

Before the Court are the District Defendants' motion for summary judgment, and the Department's motion to dismiss. (ECF Nos. 62 & 38.) For the reasons set forth below, the District Defendants' motion is GRANTED in part and DENIED in part. The SRO's decision is AFFIRMED in part, REVERSED in part, and REMANDED on a limited issue. Plaintiff's claims asserted against the District Defendants pursuant to the ADA, RA, and Section 1983 are DISMISSED. The Department's motion is GRANTED and all claims against it DISMISSED.

## BACKGROUND

### I. Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from the proceedings below,[2] which reflect the following factual background.[3]

---

[2] The District Defendants' motion for summary judgment was fully briefed as of May 4, 2016. (*See* Defs. Mot. Summ. J., ECF No. 62; Defs. Rule 56.1 Statement ("Dist. 56.1"), ECF No. 65; Defs. Mem. in Supp. Mot. ("Dist. Mem."), ECF No. 64; Decl. Laurel R. Kretzing in Supp. Mot. ("Kretzing Decl."), ECF No. 63; Pls. Counter Statement to Defs. 56.1 ("Pls. Resp. 56.1"), ECF No. 68; Pls. Opp'n to Defs. Mot. ("Pls. Opp'n"), ECF No. 67; Defs. Mem. in Reply to Pls. Opp'n ("Dist. Reply"), ECF No. 73.)

[3] For ease of reference, this decision refers to the testimony and evidence introduced at the hearing before the IHO. Citations prefixed by "C.R." refer to the page number in the Certified Record before the Court containing the relevant exhibit or hearing testimony. Referenced exhibits prefixed by "D-" refer to the District's exhibits and those prefixed by "P-" refer to Plaintiff's exhibits introduced at the impartial hearing. Exhibits introduced by the IHO are prefixed with "IHO Ex." Hearing testimony is denoted by the witnesses' last name. (*See* Dist. 56.1 ¶¶ 38-39 (listing the witnesses at the hearing).)

**A. Record Adduced at Hearing by the IHO**

At the independent hearing held to determine the appropriateness of the education plan provided by the District to A.A., four witnesses testified on behalf of the District: Meredith Grant (school psychologist), Arnold Fucci (executive director of pupil services), Eileen Mahoney (special education teacher), and Amy Avecilla (school psychologist). Five witnesses testified on behalf of Plaintiff and A.A.: David Carlson (a chairperson for the committee on special education (CSE) convened to determine the appropriate educational program for A.A), Rhonda Graff (general education teacher), Suzanne Braniecki, Ph.D. (clinical psychologist), Erin Castle (co-founder and co-director of Hawk Meadow Montessori School), and Plaintiff.[4] The Court summarizes the salient portions of the documentary and testimonial evidence below, referring to the IHO's summary and specific record citations as needed.

A.A. was born on July 17, 2002, and he was 12 years old at the time the hearing was conducted in 2014. (C.R. 49 ("IHO Opinion").) A.A. was a student at Woodglen Elementary School, a school within the District, until his parents placed him in an alternative program for his fifth grade year. (C.R. 50.) A.A.'s struggles with reading were first noticed by his mother and teacher in kindergarten. (C.R. 50.) At that time, he received an education support of 30 minutes per day of small group reading. (C.R. 50; C.R. 60 (Grant).)

*a. 2008-2009: First Grade*

The District began providing additional education supports to A.A. during his first grade year. By letter dated November 14, 2008, Woodglen's principal advised A.A.'s parents that the school was recommending "academic intervention services" (AIS) based on his performance on

---

[4] The transcripts of the testimony alone constituted nearly 4,000 pages. Additionally, numerous exhibits were presented by the parties and received into evidence.

state assessments.  (C.R. 50; C.R. 5188 (D-67).)  Plaintiff acknowledged receipt of that letter, ostensibly agreeing to A.A. receiving those additional literacy support services during the regular school day.  (*Id.*)  Ms. Grant, the school's psychologist, testified that A.A. received "building level reading support" at that time as part of a "Response to Intervention" (RTI).  (C.R. 50.)  She also indicated that it was during this year that Plaintiff shared with Ms. Grant the extent of A.A.'s challenges from his preschool years, including "emotionality," hyperactivity, and aggressive behavior directed at his brother.  (C.R. 574 (Grant).)  Ms. Mahoney, the special education teacher, became familiar with A.A. around this time and began using the "Wilson reading program" with him.  (C.R. 100 (Mahoney).)

Ms. Grant testified that she had "extensive" discussions with Plaintiff regarding conducting a special education evaluation for A.A., but Plaintiff indicated she and A.A.'s father were not in agreement on how to address his academic issues.  (C.R. 74; *see also* C.R. 575, 584 (Grant) ("Dad was against Special Ed.").)

> b.  *2009-2010: Second Grade*

During his second grade year, aside from his academic performance struggles which largely contrasted with his social skills (C.R. 117 (Graff) ("academically, the Student was really below, but socially he seemed to be almost above")), the District and Ms. Graff—A.A.'s regular education teacher at that time—noted that A.A. also struggled with completing homework on time.  (C.R. 51-52.)[5]  On September 29, 2009, A.A. was referred to the RTI team, which implemented a plan to provide additional support for him during the second grade.  (C.R. 51.)

---

[5]  The District also contended that A.A. struggled with tardiness and absences.  (C.R. 51-52.)  But at the hearing, Plaintiff contested the issue of A.A.' absences, noting that the report card from his second-grade year indicated he was absent 13 times and late only 8 times.  (C.R. 74.)  Ms. Mahoney confirmed that these were not listed as issues in the comments section of the report card.  (C.R. 101 (Mahoney).)

This included one visit by a District employee to the family home in order to assist with organizing A.A.'s learning environment.  (C.R. 51.)

The minutes from the RTI meeting indicate that A.A. did not want to go to a special education "pull-out."  (C.R. 51; C.R. 5212 (D-75) (the notes from the RTI implementation plan state Ms. Graff relayed this information).)  Instead, Ms. Graff provided specialized reading instruction using the "Wilson program" to him in her general education classroom.  (C.R. 51; *see also* C.R. 116 (Graff).)[6]  Ms. Grant testified that although Plaintiff expressed concerns about A.A.'s progress, Plaintiff and her husband were still not in agreement on how to remedy the situation.  (C.R. 53.)  In particular, the parents felt that Ms. Mahoney's special education classroom was not "socially appropriate" for A.A.  (C.R. 53; C.R. 5215 (D-76).)[7]  Because A.A.'s father did not want to move forward with a special education referral, the District—in Ms. Grant's opinion—attempted to respect the family's wishes by moving forward through the support offered via the RTI process.  (C.R. 53; C.R. 87 (Grant); *see also* C.R. 102 (Mahoney).)

Eventually the RTI team determined, however, that the supports were not enough. (C.R. 54.)  After discussing the issue with A.A.'s parents at an RTI meeting, in early 2010 the parents provided, though not without hesitation, their consent to move A.A. into Ms. Mahoney's class for ELA.  (C.R. 54; C.R. 120-21 (Graff) (testifying that Plaintiff agreed to A.A. attending Ms. Mahoney's class for English Language Arts (ELA) and Math as part of the RTI process);

_____

[6] Although Plaintiff testified that A.A. was "moved" at this time into a special education classroom with Ms. Mahoney where he remained for the entire year, the remainder of the testimony demonstrates he was not yet receiving the majority of his instruction in the special education classroom.  (C.R. 52; *but see* C.R. 5212 (D-75) (noting Ms. Graff was using the Wilson program in her classroom with A.A.), 5215 (D-76) (noting A.A. was attending Ms. Mahoney's class for Math but not for English instruction), 117 (Graff) (indicating students with individualized educational plans (IEPs) were mainstreamed for science and social studies), 120-21 (Graff) (testifying that Plaintiff agreed to A.A. receiving reading instruction services as part of the RTI prior to his classification).)

[7] There is also evidence in the record that A.A.'s general education teacher felt her classroom was "chaotic" because of behavioral issues with some of Ms. Mahoney's other students.  (C.R. 119 (Graff).)

*compare* C.R. 118 (Graff) (noting he began to attend the special education class in November or December 2009), *with* C.R. 5256 (D-90) (email chain from January 2010 where Ms. Mahoney is explaining to the other members of the RTI team the urgent need to transfer A.A. into her ELA class) *and* C.R. 4887 (P-GG) (email from Plaintiff dated February 2, 2010, acknowledging A.A.'s pending move to Ms. Mahoney's class).) Plaintiff testified at the hearing that A.A. found the environment in the special education class distracting and was very unhappy once he spent the majority of his educational time there. (C.R. 54; *see also* C.R. 3793 (Avaras) (explaining by way of an example that A.A. could not concentrate because they put him next to a student that was "rocking" back and forth).)

Notably, Ms. Graff testified that after the RTI meeting A.A. spent only 37 minutes per day in her classroom—meaning he spent the vast majority of his time in the special education classroom. (C.R. 123 (Graff).)

A.A. was also referred to the CSE at that time for evaluation. (C.R. 54; C.R. 87 (Grant); C.R. 4886 (P-FF) (letter from Plaintiff dated March 22, 2010, providing consent for evaluation).) A CSE meeting to determine his eligibility for special education services was held on April 13, 2010, concurrent with the CSE's annual review where it would formulate A.A.'s IEP for his next year of education, including recommended supports and services. (C.R. 55.) At the meeting, the CSE considered a letter provided by A.A.'s pediatrician, Dr. Satran, diagnosing A.A. with attention deficit hyperactivity disorder (ADHD). (C.R. 55; C.R. 5015 (D-13) (diagnosis letter dated April 12, 2010).) Plaintiff participated in the meeting, which resulted in the classification of A.A. as "Other Health Impaired" (OHI), though she testified she was unaware there were other potential classifications. (C.R. 56.) Ms. Grant testified that "all felt that OHI was the most accurate" classification, rather than a learning disability, given the ADHD diagnosis. (C.R. 77.)

The IEP developed by the CSE recommended that for the remainder of the 2009-2010 school year and for the 2010-2011 school year (third grade) A.A. would be placed in a special math and ELA class with a ratio of fifteen students to one teacher (15:1) for a total of two hours and fifteen minutes per day and would receive direct consultant teacher services for two hours per week in science and social studies provided in the general education classroom.  (C.R. 5016 (D-14) (IEP for 2009-2010 (indicating two hours per week of consultant teacher services)); C.R. 5026 (D-17) (IEP for 2010-2011 (indicating 30 minutes per day of consultant teacher services)).)  Although, as part of the developed IEP (C.R. 5016 (D-14)), Plaintiff consented to the initiation of special education services for A.A. (C.R. 5025 (D-16)),[8] including his continued partial placement in the special education class, she noted her objection to his "segregation" from the "mainstream population," particularly in light of his discontentment with the shift.  (C.R. 57.)

Ms. Mahoney indicated at the hearing that A.A. had "really started to improve" once he was classified.  (C.R. 104.)  Though Ms. Graff did not attend the CSE meeting, she believed A.A. needed a "multisensory" program to support his reading instruction.  (C.R. 122.)  She also felt that A.A. needed to socialize with children at his level and that the recommended program was not appropriate.  (C.R. 124.)  But, Ms. Graff never voiced these concerns because there were no other choices available.  (C.R. 124.)

Plaintiff also testified that, because she questioned the ADHD diagnosis, she took A.A. for an evaluation by Dr. Bruce Roseman on July 7, 2010.  (C.R. 57.)  Dr. Roseman diagnosed A.A. as having a pediatric speech sound disorder, dyslexia, problems with auditory processing, and attention deficit disorder (ADD) as a secondary phenomenon.  (C.R. 58; C.R. 4880 (P-CCC)

---

[8]  When Plaintiff consented to the initiation of special education services, she also acknowledged receiving "a copy of the Procedural Safeguards Notice that is required by the [IDEA]."  (C.R. 5025 (D-16); *see also* C.R. 5013 (D-12) (notice of CSE meeting to determine A.A.'s initial eligibility which also indicated Plaintiff had previously received a "Procedural Safeguards Notice" but could request another copy if needed).)

(report dated July 7, 2010 indicating "the dictionary of [his] mind is not organized"); C.R. 4869 (P-X) (letter dated May 16, 2012, clarifying his prior diagnosis as deciding A.A. was "a prime candidate to suffer from Dyslexia").) Although Plaintiff testified that she dropped off a copy of this report with a secretary at Woodglen around September 2010, the District indicated it never received a copy until the Independent Hearing process began. (C.R. 89.)

### c. 2010-2011: Third Grade

Ms. Mahoney was not A.A.'s teacher during his third grade year; rather, Mrs. Mirenberg taught his special education class. (C.R. 104.) Ms. Mahoney spoke with Mrs. Mirenberg and determined that A.A. was "progressing" but attendance was sometimes an issue. (C.R. 104.) A.A. was absent 21 days and tardy 74 days during his third-grade year. (C.R. 78; C.R. 5189 (D-68A).) Plaintiff testified that A.A. declined socially and emotionally during his third grade year and was bullied by his non-disabled and disabled peers. (C.R. 59.) Ms. Grant, in contrast, considered A.A. to be a "happy child" rather than a "tortured" soul—and testified that Plaintiff never brought up the issue of bullying until much later when A.A. was placed at Hawks Meadow. (C.R. 59.) A.A.'s IEP progress report and report card for the third grade indicated that he made progress on all of his goals and on his overall educational development. (C.R. 5193 (D-70), 5208 (D-73).)

During the CSE meeting held in April 2011 for developing A.A.'s IEP for the next academic year, the CSE recommended the same programs that were in place in April 2010 along with some additional testing accommodations. (C.R. 58.) The IEP no longer included, however, the consultant teacher services. (C.R. 5036-45 (D-20).) Although Plaintiff participated in the meeting, she testified that she voiced her disagreement with A.A.'s placement in the special education classroom and wanted to discuss alternatives. (C.R. 58.) Plaintiff testified that she

raised her concerns that he was functioning academically below where he should have been and was being bullied. (C.R. 61.) She testified that she requested his return to the mainstream general education classroom but the CSE members denied that request. (C.R. 61.) Ms. Grant testified that the CSE determined the level of support A.A. needed was beyond what could be offered in the mainstream setting. (C.R. 80; *see also* C.R. 5037 (D-20) (noting A.A. could not keep up in his social studies class without support).) Plaintiff consented to the IEP at that time. (C.R. 5037 (D-20).)

At the hearing, Ms. Grant opined that A.A. fit well within the special education classroom and his academic performance was consistent with the others in that class. (C.R. 62.) Specifically, she referenced his performance on the "Group Reading Assessment & Diagnostic Evaluation" (GRADE), noting his similar performance to peers in the class. (C.R. 79.)

### d. 2011-2012: Fourth Grade

Ms. Mahoney was again A.A.'s special education teacher during his fourth grade year. (C.R. 104.) Her view remained consistent—that A.A. required special class support for Math and English and that the special education was a good fit for him socially. (C.R. 106.) She felt his "difficulties" were exacerbated by showing up late to class or missing school. (C.R. 109; *see also* C.R. 5192 (D-69A) (A.A. had fifteen absences and thirty-two instances of tardiness that year).) Plaintiff testified that A.A. continued to attend school in the District, but that "he hated it." (C.R. 63.) She also noted that he continued to have difficulty with homework, and that Ms. Mahoney worked with him after school. (C.R. 63.) A.A.'s IEP progress report and report card for fourth grade indicated that he had achieved all of his IEP goals and made progress on his overall educational development. (C.R. 5198-5203 (D-71), 5210-11 (D-74).)

### i. Annual IEP Review

The annual review of A.A.'s IEP for the upcoming year was eventually (after some rescheduling) held on May 11, 2012.  (C.R. 64.)  After again noting A.A.'s discontentment at school, the CSE added counseling services in a small group, 30 minutes a week, to address self-esteem issues at Plaintiff's request.  (C.R. 64; C.R. 5052-5061 (D-24).)  Ms. Mahoney's view of Plaintiff's involvement at the meeting was that she was "an active participant" who agreed with and did not object to the IEP recommendations.  (C.R. 108; *but see* C.R. 5053 (D-24) (noting Plaintiff raised concerns regarding A.A.'s unhappiness and only noting that the committee members were in agreement).)  The IEP indicated that A.A. had "made wonderful progress" in reading, was in an advanced reading group, and noted that on the GRADE assessment he scored in the 5th Stanine, 45th percentile (within the average range).  (C.R. 5054-55 (D-24).)

### ii. Evaluations of A.A. Post-Annual Review

After the meeting, Plaintiff took A.A. back to Dr. Roseman on May 16, 2012, who issued a letter to Dr. Satran opining that, although he could take no position as to whether A.A. had made progress at the District, he still believed A.A. suffered from a pediatric speech sound disorder, problems with auditory processing, dyslexia, and ADD secondarily.  (C.R. 65-66; C.R. 4869-70 (P-X).)  Ms. Mahoney indicated she had never seen Dr. Roseman's reports. (C.R. 109.)  Dr. Braniecki also conducted an evaluation of A.A. at that time on May 18, 2012, but she could not definitively conclude that he had a reading disorder.  (C.R. 58; C.R. 127 (Braniecki).)  Instead, she opined that A.A. had a learning disability in written expression and that his performance on the testing was consistent with individuals with attention difficulties. (C.R. 129-30, 132, 133-34 ("her findings were consistent with a diagnosis of ADHD and a learning disability," but "she could not diagnose him with a reading disability").)  Dr. Braniecki

did not think a classification of learning disabled should replace the classification of OHI, in large part because she believed both classification were accurate and the disabilities "impact each other." (C.R. 142 (Braniecki).) The weight of the record testimony and evidence indicates that the District was unaware of Dr. Braniecki's analysis until a year later.[9] (C.R. 5113 (D-44) (consent form received by District in June 2013).)

### iii. Rejection of IEP and Decision to Place A.A. at Hawk Meadow

Plaintiff, by letter dated June 4, 2012, rejected the IEP developed for A.A.'s fifth grade year. (C.R. 66; C.R. 5062 (D-25).) Then, on August 20, 2012, Plaintiff informed the District that she would unilaterally be placing A.A. at Hawk Meadow and sought reimbursement for tuition and transportation costs. (C.R. 67; C.R. 5066 (D-29).)

A CSE meeting to discuss revising the IEP was eventually held on September 28, 2012. (C.R. 68.) There was no finding made by the CSE as to whether the District's program and the program offered by Hawk Meadow were comparable. (C.R. 90 (Fucci); C.R. 115 (Carlson) (indicating he had reached out to Ms. Castle at Hawk Meadow to learn about the school prior to the CSE meeting).) Mr. Fucci testified at the hearing, however, that he was concerned with the small number of students in the school and that both the school and its staff lacked state certification. (C.R. 91 (Fucci).) In contrast, at the hearing, Dr. Braniecki testified that a Montessori education might be appropriate, even without special education programming, because the typical strategies used in a Montessori education have been found to be helpful for children with disabilities. (C.R. 139.) At the meeting, the District agreed to provide transportation for A.A. to Hawk Meadow in resolution of Plaintiff's ten-day notice and tuition

---

[9] Plaintiff testified that she shared Dr. Braniecki's evaluation with the District verbally in May or June 2012 and provided a copy of the written report in August 2012. (C.R. 66.) The documentary evidence, however, only indicates Plaintiff provided consent for Dr. Braniecki to share the results in June 2013—a year later. (C.R. 66, 128; C.R. 5113 (D-44).)

reimbursement claim. (C.R. 5077 (D-35).)[10] Plaintiff also signed a consent for the District to send information to Hawk Meadow and the Arlington Public School District,[11] which became the District of Location and assumed responsibility for providing special education services to A.A. since Hawk Meadow was located within the Arlington School District. (C.R. 5086-5092 (D-36, D-37, D-38, D-38A, D-39).)

Ms. Grant testified that the CSE was not provided with Dr. Braniecki's report at the time these decisions were made. (C.R. 82.) Nevertheless, at the hearing, Ms. Grant opined—by comparing her initial evaluation with Dr. Braniecki's—that A.A. had made "huge" progress in reading comprehension (23rd percentile to 68th percentile), and "good growth" in other areas which indicated the District was "closing the gaps." (C.R. 82.) She also indicated that even had the scores remained constant it would have indicated growth, since the tests are based on age and grade level. (C.R. 83.)

### e.  2012-2013: Fifth Grade at Hawk Meadow

Ms. Castle, the co-founder of Hawk Meadow,[12] described the Montessori education program as a "scaffolded sequential educational curriculum," and explained that the instruction is essentially entirely differentiated: "each child is working at his or her own pace." (C.R. 145 (Castle), C.R. 149.) She explained that all Montessori materials incorporate visual, auditory, and kinesthetic properties—*i.e.*, are multisensory. (C.R. 156.) She also confirmed that Hawk Meadow is not approved by New York State to provide special education. (C.R. 147.) At Hawk

---

[10]  The District also complied with Plaintiff's request to send her a copy of all documents in A.A.'s CSE file. (C.R. 5064-65 (D-27 & D-28); C.R. 5111-12 (D-43); C.R. 5130 (D-47).)

[11]  Because Plaintiff did not sign reciprocal consents allowing Hawk Meadow and Arlington to send information back to the District, no information regarding A.A.'s education and progress was received by the District after the placement. (C.R. 5108-09 (D-42A) (Hawk Meadow and Arlington to the District).)

[12]  The other co-founder of Hawk Meadow was Plaintiff's sister. (C.R. 144.)

Meadow, A.A. was instructed by Ms. Ryan, who had the most Montessori certification and nearly 30 years of experience teaching Montessori programs. (C.R. 148.)

During his fifth grade year at Hawk Meadow, A.A. was in an upper elementary group with a total of five students. (C.R. 149.) He was the only student that would have been categorized as a fifth grader based on age. (C.R. 151.) The upper elementary classroom is one large classroom with a smaller room, with a door that can be closed, which can be used for individual lessons and services. (C.R. 151.) Students either receive one-on-one instruction or work on their various assignments. (C.R. 155.)

A.A.'s typical day included spending approximately half of his morning period (1.5 of 3 hours) seated at a desk in the smaller room. (C.R. 156.) While at the desk, he received instruction from a teacher for about an hour. (C.R. 156.) During his independent work time, a teacher was situated approximately ten feet away. (C.R. 156.)

Throughout this year, Ms. Graff also acted as a tutor for A.A. in connection with an additional teaching certification program she was completing. (C.R. 125 (Graff).) She indicated that Hawk Meadow was using a "multisensory" approach based on the "Orton-Gillingham" model in teaching its students. (C.R. 126.) Ms. Castle clarified during her testimony that the school followed the "Sequential English Education" (SEE) approach, which was "specifically designed to help students with reading and writing difficulties." (C.R. 152.) She also testified at the hearing that the recommendations Dr. Braniecki had made as part of her evaluation were implemented in the course of instruction that A.A. received. (C.R. 160.)

Ms. Graff saw a difference in A.A.'s view of school: he was excited to share what he was doing at Hawk Meadow. (C.R. 126.) He also confided in her about some of the bullying he experienced at Woodglen. (C.R. 126.) Overall, she observed A.A. make slow upward progress

despite continuing to struggle. (C.R. 126.) Ms. Castle testified that when A.A. entered Hawk Meadow as a fifth grader, he was only reading at a second or third grade level; yet, at the time of the hearing, A.A. had advanced to a fifth grade level and was interpreting passages. (C.R. 157.)

*i. IESP Formulation, Annual IEP Review, and Re-evaluation of A.A.*

On December 17, 2012 and again on April 9, 2013 for fifth and sixth grades respectively, CSE meetings were convened by Arlington for A.A. and individual education services plans ("IESP") were developed which maintained A.A.'s OHI classification and provided limited services. (C.R. 4898-4907 (P-QQ) (providing consultant teacher services three times per year for one hear each session); C.R. 4818-28 (P-L) (increasing the consultant teacher services to four times per year and adding small group occupational therapy once a week for thirty minutes).) At the hearing, Ms. Grant reviewed the IESPs prepared by Arlington and opined that the services to be provided would have been insufficient for A.A. to progress. (C.R. 84 (noting the amount of consultant teacher services did not comply with the state's minimum requirements).)

At the District's annual review for the 2013-2014 school year, held on June 19, 2013, the District's recommendations for A.A.'s IEP remained largely the same. (C.R. 70-71; C.R. 5095-5105 (D-41) (adding 45 minutes per day of a five student resource room).) Plaintiff, however, expressed her desire for A.A. to be placed in the mainstream at the District in a fashion that addressed his dyslexia. (C.R. 71.) The parties agreed to conduct a re-evaluation of A.A. (C.R. 71.) Mr. Fucci indicated he had first learned of Dr. Braniecki's report around the time of this meeting. (C.R. 94.)

Mr. Fucci testified at the hearing that he believed the program recommended by the CSE was "appropriate" based on the information available to the CSE at that time. (C.R. 99.) In contrast, Ms. Graff testified that the IEP was deficient because it did not provide an appropriate

amount of time for a Wilson-based reading program.  (C.R. 124 (Graff).)  Moreover, the comments attached to the IEP indicated that the CSE did not have sufficient information to develop an IEP for A.A. and that "[a] meeting for the development of a 2013-14 IEP will be arranged."  (C.R. 5095-5105 (D-41).)  Despite multiple requests made by the District, the documentary evidence suggests that Plaintiff did not provide a release allowing for information regarding A.A.'s progress at Hawk Meadow to be sent to the District until the end of the school year.  (C.R. 69, 72, 97; C.R. 4804 (P-I) (Hawk Meadow to the District dated June 19, 2013), 4927 (P-ZZ) (same), 4896 (P-OO) (Arlington to the District also dated June 19, 2013), 4926 (P-YY) (same), 4928 (P-AAA) (same), 4798 (P-C) (Arlington to Hawk Meadow and the District dated September 20, 2013); *see also* C.R. 92-93, 95 (Fucci); C.R. 5108-09 (D-42A) (Hawk Meadow and Arlington to the District).).

Ms. Avecilla, a school psychologist employed by the District, was asked to conduct the re-evaluation of A.A. on June 20, 2013.  (C.R. 110 (Avecilla).)  Ms. Avecilla received a copy of the Braniecki report from Plaintiff prior to conducting her evaluation of A.A.  (C.R. 111.)  After conducting the re-evaluation, however, Ms. Avecilla did not share her results with the CSE because she was missing an updated social history from Plaintiff.  (C.R. 112.)

Although the CSE did not have access to Ms. Avecilla's evaluation when it made its decisions, Ms. Grant compared it to Dr. Braniecki's report during the hearing and opined that A.A. had generally declined—which was to be expected given his drastic decline in reading comprehension (68th percentile to 37th percentile).  (C.R. 85; *see also* C.R. 111-12 (Avecilla) (testifying regarding general decrease in standardized testing scores during re-evaluation, but noting A.A.'s word reading had increased from the 32nd to 50th percentile).)  Notably, however,

Dr. Braniecki opined at the hearing that the decline "may or may not" be a result of A.A.'s attendance at Hawk Meadow.  (C.R. 140.)

*ii.   Renewed Rejection of the District's IEP*

A.A.'s parents delivered a letter to the District on August 26, 2013 informing it, again, that they intended to place him in a nonpublic school at public expense.  (C.R. 5142 (D-50).).  The District also definitively received a copy of Dr. Braniecki's evaluation in September 2013, after Plaintiff provided a release allowing Dr. Braniecki to share it.  (C.R. 71; *see also* C.R. 94 (Fucci indicating he was aware of the Braniecki evaluation at the June CSE meeting).)

A CSE meeting was scheduled to convene on September 18, 2013 to review the recommended IEP and results of Ms. Avecilla's evaluation.  This meeting was cancelled by Plaintiff and rescheduled for October 9, 2013.  (C.R. 5152-60 (D-55 – D-57).)  Ultimately, Plaintiff decided not to attend a CSE meeting, and instead, through her attorney, demanded a Due Process Hearing by letter dated September 27, 2013.  (C.R. 5265 (IHO Ex. 3)).  That demand was followed by a resolution meeting, held on October 29, 2013 (C.R. 5183-87 (D-66)), where no resolution was reached.

*f.   2013-2014: Sixth Grade at Hawk Meadow*

During his sixth grade year at Hawk Meadow, A.A. was in an upper elementary group with a total of nine students.  (C.R. 149.)  He was the only student that would have been categorized as a sixth grader, or middle-schooler, based on his age.  (C.R. 151.)  As for the other students in A.A.'s class, two others had behavioral issues, one had dyslexia, and another had language delays and attentional issues; the remaining students had no noted academic or behavioral issues.  (C.R. 169 (concluding this information conflicted with the class profile); *but see* C.R. 5261 (D-91), 4962-63 (P-III) (listing nine students in total, four without classifications,

two with behavioral issues, one with a learning disability, one with a "speech or language impairment," and A.A.).)  Ms. Castle testified that Hawk Meadow is registered to provide education through the middle school level with the Montessori Society, but it is not recognized as such by New York State and the founders have no middle school training.  (C.R. 166.)

Over the course of this year, A.A. became more comfortable with his independent workstation—the desk in the small room.  (C.R. 156.)  He spent approximately two-thirds of his morning period (2 of 3 hours) seated at the desk.  (C.R. 156.)  While at the desk, he received instruction from a teacher for about 45 minutes.  (C.R. 156.)  In the afternoon session, which lasted 1.5 hours, he worked at the desk independently for half that time.  (C.R. 156.)

Though he was resistant, he also participated in occupation therapy, starting in the winter or spring of this year, as recommended and provided by the Arlington school district as part of its IESP.  (C.R. 158-60.)  The IESP did not, however, contain any reading, math, or writing goals, despite A.A.'s below grade level functioning in those areas.  (C.R. 173.)

Plaintiff testified that it was not until this year that she witnessed social, emotional, and academic growth from A.A.'s placement at Hawk Meadow.  (C.R. 163 (she indicated the first year was difficult for him).)  Ms. Castle reviewed the November 2013 progress report from this year, and testified that it showed some regression but also improved confidence.  (C.R. 170; C.R. 4788 (P-B) (progress report prepared by Ms. Ryan and three others).)  When asked to compare the report from the end of the previous year (C.R. 4805 (P-J)) with the November report, she noted some progress and a number of areas where his progress decreased.  (C.R. 171.)

### B. IHO & SRO Decisions

As a result of Plaintiff's September 27, 2013 due process demand, an impartial hearing was conducted over the course of 18 days between January 13, 2014 and July 16, 2014—during the second half of A.A.'s sixth grade year. Plaintiff was represented by counsel at the hearing. On September 8, 2014, the independent hearing officer issued a 191-page decision consisting of findings of fact and conclusions of law. (*See generally* IHO Opinion (C.R. 23-239).)

Ultimately, the IHO denied Plaintiff's application for full reimbursement and prospective payment for tuition, related expenses, and transportation to and from Hawk Meadow for the 2012-2013, 2013-2014, and 2014-2015 school years; and denied reimbursement for various other expenses sought by Plaintiff including compensatory services for the 2011-2012 school year. (C.R. 236-37.) Specifically, the IHO concluded: 1) Plaintiff's claims relating to the 2011-2012 school year (fourth grade) were time-barred, 2) the District offered the student an appropriate education for the 2012-2013 school year (fifth grade), 3) the District failed to offer the student such an education for the 2013-2014 school year (sixth grade), and 4) Hawk Meadow was, nevertheless, not an appropriate alternative placement. (*See generally* IHO Opinion at 146-51, 155-64, 164-69, and 169-80.)

Plaintiff sought review of the IHO's decision, and, on November 14, 2014, the State Review Officer ("SRO") affirmed the decision and denied the District's cross-appeal challenging the IHO's determination that a) the District was required to prepare an IEP for the 2013-2014 school year and b) the District's IEP for that year did not provide a free and appropriate public education. (C.R. 291-335.) This action ensued.

## II.      Procedural History

Plaintiff filed her complaint in this matter on March 12, 2015.  (ECF No. 2.)  She subsequently amended the complaint twice, first on June 9, 2015 (ECF No. 6), and again on December 31, 2015—the operative complaint in this action.  (Compl., ECF No. 29.)  The District Defendants answered on January 29, 2016.  (ECF No. 35.)

The Department moved to dismiss the complaint with regard to any claims asserted against the state education department (ECF No. 38),[13] while the District Defendants moved for summary judgment (ECF No. 62).

## LEGAL STANDARDS

## I.      Legal Framework of the IDEA[14]

The "purpose" of the Individuals with Disabilities Education Act "is 'to ensure that all children with disabilities have available to them a free appropriate public education.'"  *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)).  As the Second Circuit has recently described it, this means "an education 'likely to produce progress, not regression,' and one that 'afford[s] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (quoting *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015)); *accord Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all").

---

[13]   The Department's motion to dismiss was fully briefed as of April 19, 2016.  (See Dep't Mot. Dismiss, ECF No. 38; Dep't Mem. in Supp. Mot. ("Dep't Mem."), ECF No. 40; Decl. Mark E. Klein in Supp. Mot. ("Klein Decl."), ECF No. 39; Pls. Opp'n to Dep't Mot. ("Pls. Opp'n II"), ECF Nos. 45-51 & 55; Dep't Reply to Pls. Opp'n II ("Dep't Reply"), ECF No. 43.)

[14]   The IDEA was amended by the IDEIA in 2004.  *See E.M. v. N.Y. City Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014)

"The 'centerpiece' of the IDEA and its principal mechanism for achieving this goal is the IEP." *T.K.*, 810 F.3d at 875. "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IDEA imposes upon school districts the duty to seek out children with a disability and ensure that they receive the special education services they need. 20 USC § 1412(a)(3); 34 C.F.R. § 300.111 (a)(1)(i); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similarly, "an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451 (2d Cir. 2015). And, "an IEP must be drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)).

"The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(III)). It "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting § 1414(d)(1)(A)(i)(IV)).

In addition to providing an education likely to produce progress, tailored to the unique needs of the child, the program must be offered in the least restrictive environment. 20 U.S.C.

§ 1412 (a)(5)(A); N.Y. Comp. Codes R. & Regs. §§ 200.1(cc), 200.6(a1); *see C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 467-68 (S.D.N.Y. 2015) (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013)) (one of the IDEA's goals is "to provide disabled children with a public education 'while protecting them from being inappropriately sequestered in a special-education classroom'"). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with *that* student's needs, *not* the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (emphasis added and citation omitted). "This requirement 'expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted in original).

"Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." *T.K.*, 810 F.3d at 875. A school district will be required to reimburse parents for expenditures made for a private school placement, if the services offered the student by the school district are inadequate or inappropriate. *See Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 13-16 (1993); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985). Following the *Burlington/Carter* test, once a court determines that a child has been denied an appropriate educational opportunity by the public school district, the remaining considerations are "whether the parents' private placement is appropriate to the child's needs" and the balance of the equities. *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).

"Generally, 'the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in determining the appropriateness of the parents' placement'; accordingly, the private placement must be 'reasonably calculated to enable the child to receive educational benefits.'" *Doe*, 790 F.3d at 451 (citation omitted). "Under New York law, 'the [school district] bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement.'" *T.K.*, 810 F.3d at 875 (quoting *C.F.*, 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c))).[15]

## II.    Exhaustion Under (and Alternatives to) the IDEA

When a plaintiff initiates an action that "seek[s] relief for the denial of a [free and appropriate public education]," which is "the only 'relief' the IDEA makes 'available,'" she must follow the IDEA's exhaustion procedures regardless of whether the action is filed "under the ADA, the Rehabilitation Act, or similar laws[.]" *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 752 (2017). "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." *Id.* "[I]f, in a suit brought under a different statute, the remedy sought" is not covered by the IDEA, "then exhaustion of the IDEA's procedures is not required." *Id.* at 754 ("After all, the plaintiff could not get any relief from those procedures: A hearing officer, [lacking the power to order any relief], would have to send her away empty-handed.").

---

[15] "It remains an open question whether states may deviate from the IDEA's default rule, as New York does, by placing the initial burden on the school board." *Reyes ex rel. R.P. v. N.Y. City Dep't of Educ.*, 760 F.3d 211, 219 (2d Cir. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005)) ("the Supreme Court has interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge").

### III.      Standard of Review

In IDEA actions, district courts follow a procedure that is in substance an appeal from an administrative determination, not a traditional summary judgment analysis. Thus, the usual summary judgment considerations, of whether material factual disputes exist, are not employed; rather, the court "must engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence[.]" *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385-86 (2d Cir. 2014) (internal quotations and citations omitted). That independent review, however, is not without significant limitations. "The role of the federal courts in reviewing state education decisions under the IDEA is circumscribed." *C.F.*, 746 F.3d at 77. The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *Id.* at 77 (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)). The SRO has special expertise in educational matters involving the IDEA and its decisions, when "thorough and well reasoned," are entitled to deference. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

Under this deferential review, "[w]here the IHO and SRO disagree," a federal court will "defer to the reasoned conclusions of the SRO as the final state administrative determination." *C.F.*, 746 F.3d at 77 (citation omitted). "However, where the SRO's determinations are insufficiently reasoned to merit deference," or when "considering an issue not reached by the SRO," the reviewing court "should defer to the IHO's analysis." *Id.* (citation omitted). "District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the

opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (alterations and internal quotation marks omitted).

## DISCUSSION

Plaintiff's claims can be categorized either as falling within the ambit of the IDEA, *i.e.* seeking relief from the denial of a free and appropriate public education, or as claims seeking relief for other, potentially related, discrimination pursuant to the ADA, RA, or Section 1983. The Court first addresses her IDEA claims, as they represent the majority of the issues presented.

## I. IDEA Claims

Plaintiff's IDEA claims are only properly asserted against the District Defendants.[16] Furthermore, this Court can only review claims that are exhausted, meaning they were brought to the state agency for its consideration. In New York, a plaintiff must engage in the state's "two-tier administrative system for review of IEPs": first, she must seek review by an independent hearing officer; and second, she must appeal any adverse result to a state review officer. *See Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008); *see also B.C. ex rel. B.M. v. Pine Plains Cent. Sch. Dist.*, 971 F. Supp. 2d 356, 365 (S.D.N.Y. 2013) ("a plaintiff's failure to satisfy the IDEA's exhaustion requirement deprives the Court of subject matter jurisdiction"); *Myslow v. New Milford Sch. Dist.*, No. 03 Civ. 496 (MRK), 2006 WL

---

[16] The District's receipt of federal funding allows it to be sued in federal court under the statute, but the State Education Department—which is not responsible for the day-to-day formulation of students' IEPs—is not the proper party to a suit challenging an administrative determination as to the sufficiency of the IEPs provided by the local education agency. *See Y.D. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 1137 (LTS), 2016 WL 698139, at *5 (S.D.N.Y. Feb. 19, 2016) (citing 8 N.Y. Comp. Codes R. & Regs. § 279.1(c)(1) (prohibiting the SED from appearing as a party before a State Review Officer)); *J.E. v. Chappaqua Cent. Sch. Dist.*, No. 14 Civ. 3295 (NSR), 2015 WL 4934535, at *7 (S.D.N.Y. Aug. 17, 2015) (the Department is not "a proper or necessary party") (citing *B.J.S. v. State Educ. Dep't/Univ. of N.Y.*, 699 F. Supp. 2d 586, 600-01 (W.D.N.Y. 2010) (the "State Department of Education may not be sued as a defendant in an IDEA action brought pursuant to § 1415(i)(2)(A)") (collecting cases)); *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 935 (W.D. Tex. 2008) (Congress "condition[ed] 'a state's receipt of federal IDEA funds on its consent to suit under that Act,'" allowing "an individual [to] hale a school district, as a subdivision of the state, into federal court.") (internal citation omitted).

473735, at *12 (D. Conn. Feb. 28, 2006) (only IDEA claims related to an IHO's explicit findings, appealed to the SRO as necessary, are appropriately exhausted).

Thus, any IDEA claims not fairly encompassed by the initial due process notice have not been exhausted and cannot be considered; the same holds true for adverse findings made by the hearing officer that are not appealed to the SRO. *See M.O.*, 793 F.3d at 245 (challenges not made in due process complaint were not cognizable on review); *B.M. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3247 (JMF), 2013 WL 1972144, at *5 (S.D.N.Y. May 14, 2013), *aff'd*, 569 F. App'x 57 (2d Cir. 2014) ("A district court [] may only review issues raised in a plaintiff's due process complaint"); *see, e.g.*, *P. v. Greenwich Bd. of Educ.*, 929 F. Supp. 2d 40, 50 (D. Conn. 2013) (child-find claims were not exhausted because they were not a part of plaintiffs' initial due process request); *see also* 8 N.Y. Comp. Codes R. & Regs. § 200.5(j)(5)(v) ("The decision of the impartial hearing officer shall be binding upon both parties unless appealed to the State review officer"); *C.H. v. Goshen Cent. Sch. Dist.*, No. 11 Civ. 6933 (CS), 2013 WL 1285387, at *10 (S.D.N.Y. Mar. 28, 2013) ("this Court has the power to decide only those issues . . . not waived by failing to appeal or cross-appeal to the SRO an adverse finding by the IHO").

Comparing the appeal to and decision by the SRO with the IHO's decision in response to Plaintiff's due process request, it is apparent that there are three fully exhausted issues: 1) whether A.A. can assert claims relating to the period of time prior to the 2012-2013 school year or whether those claims are time-barred, 2) whether A.A. received an appropriate educational opportunity during the 2012-2013 and 2013-2014 school years, and 3) whether his unilateral placement at Hawk Meadow beginning in the 2012-2013 school year was appropriate. (*Compare* C.R. 5265-73 (¶¶ 1-2, 7-9, ¶¶ 3-6, 9-16, & ¶ 17), *with* C.R. 10 (¶¶ 1-2, ¶¶ 3-7, ¶ 8).) These are the only IDEA claims, ripe for review, over which this Court has jurisdiction.

### a.   Timeliness of the pre-2012-2013 school year claims

"[A]n IDEA claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 116 (2d Cir. 2008) (citing *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003)).  Once a claim accrues, a plaintiff has two years to act or risk the claim becoming time-barred.  *See* 20 U.S.C. § 1415(b)(6)(B) (a plaintiff must have "[a]n opportunity . . . to present a complaint . . . which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint"); 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint").  Plaintiff requested a due process hearing on September 27, 2013.  Therefore, any claims of which she should have been aware predating September 27, 2011 are barred by the statute of limitations.

While claims relating to the IEPs and the educational services provided for A.A.'s fifth and sixth grade years are certainly timely,[17] Plaintiff, as part of her due process complaint, also sought review of the services provided prior to and during the 2011-2012 school year.  Plaintiff argued below, (*see* C.R. 247-48), that she could not be "charged with knowledge of the District's classification error at a time when [she] believed, erroneously, that the District had reviewed all relevant records and made a determination based on all records," and argued "the proper measuring date is no earlier than May 11, 2012, the date of the annual review when [Plaintiff] expressed concerns to the CSE about A.A.'s lack of progress."  (*Id.* at 274)  The SRO, however,

---

[17]   The IEP for A.A.'s 2012-2013 school year was prepared May 11, 2012 and the IEP for A.A.'s 2013-2014 school year was prepared June 19, 2013.

concluded that "[t]he hearing record support[ed] the IHO's determination that the [] child find claim accrued no later than April 13, 2010, the date the CSE determined the student was eligible for special education services as a student with an other health-impairment." (C.R. 13.) The SRO also determined that "the parents were aware in July 2010, at the latest, that the student had received a diagnosis of dyslexia" which was "the basis for the parents' claim that the other health impairment classification was inappropriate[.]" (C.R. 14.)[18]

This Court, viewing the timeline similarly, concurs with this portion of the SRO's analysis. Based on the facts established at the independent hearing, this Court concludes that Plaintiff became aware of a number of potential issues with A.A.'s educational opportunities during the build up to the April 2010 and April 2011 CSE meetings—meaning that those claims accrued before September 27, 2011 and are time-barred.

*First*, despite "extensive" discussions with Woodglen's psychologist about having A.A. evaluated for special education services beginning as early as the 2008-2009 school year, Plaintiff was hesitant to engage in that process.[19] The school, therefore, offered RTI services to A.A. to support his educational needs, rather than a special education referral, due to the parents' resistance to moving forward with the evaluation process. (C.R. 53; C.R. 87 (Grant); C.R. 102 (Mahoney).) *Second*, Plaintiff was aware of and voiced her concerns to A.A.'s placement in a

---

[18] The SRO also agreed with "the IHO's determination that even if the other health-impairment classification were not the most appropriate, it did not compromise the student's right to an appropriate education, significantly impede the parents' opportunity to participate in the development of the IEP, or cause a deprivation of educational benefits." (C.R. 15.) The Court need not consider this latter conclusion during the period that is stale.

[19] "Under the IDEA, each state receiving federal funds must 'ha[ve] in effect policies and procedures,' by which it will identify, locate, and evaluate '[a]ll children with disabilities residing in the state' to determine whether these children require special education and related services." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 219 F. Supp. 3d 421, 456 (S.D.N.Y. 2016) (quoting 20 U.S.C. § 1412(a) and § 1412(a)(3)(A)). This is commonly referred to as a District's "child-find" obligation. "When a school board violates [this] obligation by not evaluating a child suspected of being disabled, it necessarily fails to provide that student a FAPE." *Id.* (quoting *Greenwich Bd. of Educ. v. G.M.*, No. 13 Civ. 235, 2016 WL 3512120, at *8 (D. Conn. June 22, 2016)).

special education classroom: although she consented to the initiation of special education services for A.A. during the 2009-2010 school year (C.R. 5025 (D-16)), she noted her objection to his "segregation" from the "mainstream population." (C.R. 57; *see also* C.R. 3099-3101 (Avaras).)[20]  *Third*, Plaintiff was also aware of any issues regarding the classification given to A.A. and whether the IEP encompassed all of his potential disabilities.  A.A. was classified that year as OHI, rather than learning disabled, based on an ADHD diagnosis provided to the CSE by Plaintiff (C.R. 5015 (D-13)); yet—because she questioned that diagnosis—she also possessed as of July 7, 2010, the conflicting opinion of Dr. Roseman, diagnosing A.A. as having *inter alia* dyslexia *and* attention deficit disorder (ADD).  (C.R. 4880 (P-CCC).)

Finally, Plaintiff was aware that *none* of her concerns with the IEP developed for A.A. were addressed when the annual review meeting was held in April 2011 to develop his IEP for the next academic year (2011-2012).  At the meeting, the CSE recommended generally the same programs that were in place in April 2010.  Moreover, the IEP no longer included consultant teacher services.  (C.R. 5036-45 (D-20).)  Plaintiff participated in the meeting, she voiced her disagreement with A.A.'s placement in the special education classroom and her concern that he was not progressing, and, although she specifically requested his return to the mainstream general education classroom, the CSE members denied that request.  (C.R. 3131-35 (Avaras).)

This final instance serves as the most comprehensive example of her awareness of all of the District's alleged failings up to that point: when the District re-implemented the OHI-based

---

[20]  After the RTI meeting, A.A. spent the vast majority of his time in a self-contained special education class.  (C.R. 123 (Graff).)  When those services were formalized during the April 13, 2010 CSE meeting, that placement became part of A.A.'s IEP for the next school year.

Plaintiff finds support in her objections to A.A.'s placement in the special education classroom from Ms. Graff, who, although she did not attend the CSE meeting, believed A.A. needed a "multisensory" program to support his reading instruction and felt that he needed to socialize with children at his level.  (C.R. 122-24.)  She independently concluded that the program recommended by the District was not appropriate.  (C.R. 124.)  But, Ms. Graff never voiced these concerns because there were no other choices available.  (C.R. 124.)

IEP for the 2011-2012 school year in April 2011 without adjusting A.A.'s placement in the special education classroom, his classification, or the services provided, Plaintiff knew or should have known that he was—in her view—inappropriately sequestered away from his mainstream peers in a setting that was not tailored to address his potential dyslexia. She was also more than aware of any potential claim that the District had failed in its child-find obligations at that point.[21] Therefore, the Court must agree with the SRO that these claims are time-barred.

Plaintiff was aware of all of these issues more than two years prior to the point at which she filed her due process complaint.[22] There are no issues related to this determination that require additional discovery. *Cf. K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16 Civ. 3138 (KMK), 2017 WL 2417019, at *9 (S.D.N.Y. June 2, 2017) (because plaintiffs alleged that aspects of their

---

[21] Though an educational agency "cannot abdicate its affirmative duties under the IDEA," *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055-56 (9th Cir. 2012) (citation omitted), "[w]hen parents waive their child's right to services, school districts may not override their wishes." *Fitzgerald v. Camdenton R-III Sch. Dist.*, 439 F.3d 773, 775 (8th Cir. 2006). The record amply supports the conclusion that the District was attempting to fulfill its child-find obligations and met with some, perhaps understandable, resistance from Plaintiff to initiating the special education referral process. *See W.A.*, 219 F. Supp. 3d at 456–57 ("a state's child find duty is triggered when it has reason to suspect that special education services may be needed to address the disability") (citation omitted); *V.M. v. N. Colonie Cent. Sch. Dist.*, 954 F. Supp. 2d 102, 118 (N.D.N.Y. 2013) ("if a parent refuses to consent to the receipt of special education and related services, or fails to respond to a request to provide such consent, 'the local educational agency shall not be considered to be in violation'" of its obligations).

[22] Plaintiff cannot rely on the exceptions to the statute of limitations, *see* 20 U.S.C. § 1415(f)(3)(D) (involving either specific misrepresentations or withholding of required information by the District), given her ostensible receipt of a procedural safeguards notice and parental guide to the evaluation process as early as February 2010 and receipt of multiple notices re-advising her of her procedure rights. (*See, e.g.*, C.R. 4988 (D-4) (letter dated February 9, 2010 from the District to Plaintiff regarding "the information that [she] need[ed] to refer [her] son [] to the Committee on Special Education (CSE) to determine if he is a student with a disability"); C.R. 5010 (D-9) (letter dated March 18, 2010 from the District to Plaintiff questioning if she wanted to withdraw the referral to the CSE and, again, enclosing the "Procedural Safeguards" and "Parent Guide"); C.R. 5013 (D-12) (notice dated April 7, 2010 regarding the initial eligibility determination meeting noting that Plaintiff had previously received a "Procedural Safeguards Notice" but could request another copy if needed); C.R. 5025 (D-16) (consent for the initiation of special education services, dated April 13, 2010, which specifically indicated Plaintiff had "received a copy of the Procedural Safeguards Notice that is required by the Individuals with Disabilities Education Act (IDEA)"); C.R. 4874 (P-AA) (annual review notice dated March 27, 2012, noting that Plaintiff had previously received a "Procedural Safeguards Notice" but could request another copy if needed); C.R. 4873 (P-Z) (annual review notice dated April 23, 2012, noting that Plaintiff had previously received a "Procedural Safeguards Notice" but could request another copy if needed)); *see also Richard R.*, 567 F. Supp. 2d at 945 ("When a local educational agency delivers a copy of IDEA procedural safeguards to parents, the statutes of limitations for IDEA violations commence without disturbance.").

claims were not uncovered until the commencement of the hearing process, discovery was needed to ascertain when the claims accrued).  Because these issues accrued before September 27, 2011 and indeed were crystalized by April 2011 at the latest, the claims stemming from before the 2012-2013 school year are stale.

     **b.   Review of SRO Affirmance of IHO Decision Regarding the IEPs for A.A.'s 2012-2013 & 2013-2014 School Years and His Placement at Hawk Meadow**

The Court, therefore, engages in a review of the properly exhausted and timely claims considered by the IHO & SRO, which were in agreement, to determine whether the state review process is undeserving of deference—that is, whether those decisions are against the preponderance of the evidence keeping in mind the state agencies' special expertise in educational matters.  A review of the record indicates that the primary issues in this case are whether A.A. was placed in an inordinately restrictive and insufficiently tailored environment while at Woodglen, and whether, given Plaintiff's view that he was not advancing and not mainstreamed there, his placement at Hawk Meadow was an appropriate alternative.  (*See also* Compl. at 5-6, 8.)

     *i.   Whether A.A. Was Offered a Free and Appropriate Public Education in the Least Restrictive Environment During the 2012-2013 School Year*

The IHO and SRO agreed that A.A. was offered an appropriate educational opportunity for his fifth grade year.  (C.R. 16-19 (SRO); C.R. 198-208 (IHO).)  The District Defendants unsurprisingly support this conclusion and argue that "the evidence presented [at the hearing] shows that the District accurately identified A.A.'s educational needs, and provided A.A. with appropriate special education services and supports to meet his needs."  (Dist. Mem. at 15.)

"[T]he [IDEA] guarantees [] an *appropriate* education, not one that provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132 (internal quotation marks and citation omitted) (emphasis added).  As for the appropriateness of the education

provided, "[t]he IDEA demands . . . an educational program reasonably calculated to enable a child to make progress appropriate in light of th[at] child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. In considering the adequacy of the IEP developed for A.A.'s fifth grade year (which was ultimately unilaterally rejected in favor of private placement at Hawk Meadow (*see* C.R. 5066 (D-29))),[23] certain facts established at the hearing are worth reiterating here.

*First*, A.A.'s IEP progress report and report card for his fourth grade year at Woodglen indicated that he had achieved all of his IEP goals and made progress on his overall educational development. (C.R. 5198-5203 (D-71), 5210-11 (D-74).) Moreover, the notes attached to the IEP developed for his fifth grade year indicated that he had "made wonderful progress" in reading, was in an advanced reading group, and noted progress based on his GRADE assessment results,[24] which placed him in the average range.[25] *Second*, the District indicated it never received a copy of Dr. Roseman's dyslexia diagnosis until the independent hearing process

---

[23] A CSE meeting to discuss revising the IEP was held on September 28, 2012. (C.R. 68.) There was no finding made by the CSE as to whether the District's program and the program offered by Hawk Meadow were comparable. (C.R. 90 (Fucci); C.R. 115 (Carlson) (indicating he had reached out to Ms. Castle at Hawk Meadow to learn about the school prior to the CSE meeting).)

[24] A.A.'s Comprehension Composite score moved from 4 to 5 (Stanines) based on a six percentile change. His Total Test score stayed at 5 (Stanines) but also included a six percentile increase. (*Compare* C.R. 5038 (D-20) ("Comprehension Composite 4 (Stanines), 36 (Percentile)" and "Total Test 5 (Stanines), 39 (Percentile)"), *with* C.R. 5054-55 (D-24) ("Comprehension Composite 5 (Stanines), 42 (Percentile)" and "Total Test 5 (Stanines), 45 (Percentile)").)

"Stanine" scaling, or "STAndard NINE," is commonly used in educational assessment and involves dividing the normal distribution of particular test scores into nine intervals, Stanines 1 through 9, with 1 being the lowest, 9 being the highest, and 5 representing the average. *See Rios v. Read*, 480 F. Supp. 14, 23 (E.D.N.Y. 1978).

[25] At the hearing, Ms. Grant opined—by comparing her initial evaluation with Dr. Braniecki's—that A.A. had made "huge" progress in reading comprehension (23rd percentile to 68th percentile), and "good growth" in other areas which indicated the District was "closing the gaps." (C.R. 82.) She also indicated that even had the scores remained constant it would have indicated growth, since the tests are based on age and grade level. (C.R. 83.) Thus, despite not having access to the Braniecki results, the other data relied upon by the District concurred with the post-hoc evaluation performed by Ms. Grant at the independent hearing. This Court considers this evidence, particularly since it was introduced at the hearing below. *Cf. G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 555 (S.D.N.Y. 2010), *aff'd*, 486 F. App'x 954 (2d Cir. 2012) (reviewing courts "generally accept evidence that was not withheld in bad faith, is relevant, and does not change the administrative review into a trial de novo"); 20 U.S.C. § 1415(i)(2)(C) (a reviewing court "shall hear additional evidence at the request of a party").

began, (C.R. 89), and Dr. Braniecki's evaluation had not been completed at this point. Consequently, the IEP developed for A.A.'s fifth grade year included only an OHI classification. *Third*, at Plaintiff's request during the CSE annual review, the CSE added counseling services in a small group, 30 minutes a week, to A.A.'s IEP to address self-esteem issues. (C.R. 64; C.R. 5052-5061 (D-24)); *see also T.K. v. New York City Dept. of Educ.*, 810 F.3d 869, 876 (2d Cir. 2016) (assuming that "bullying of a student with a disability is an appropriate consideration in the development of an IEP and can result in the denial of a FAPE under the IDEA").

Accepting that the District may not have had the benefit of the dyslexia diagnosis, the primary consideration is whether A.A., who in the CSE's estimation—confirmed by the reviewing state agencies—had received an educational benefit and progressed in his plan of study,[26] received his education in the least restrictive environment tailored to address his unique needs. "[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures" and "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress." *M.H.*, 685 F.3d at 244.

The instant disputes, which concern the substantive adequacy of the IEP and whether an appropriate educational methodology in A.A.'s instruction, thus require greater deference to the

---

[26] Plaintiff argued below that "nothing in [A.A.'s] test results or IEPs indicate[d] anything more than trivial educational benefit" was provided by the District. (C.R. 252.) Woodglen's psychologist, however, testified that students were advancing even when their scores remained constant from year to year, because the tests were designed to measure grade-level achievement. In A.A.'s case, his GRADE results indicated a six percentile increase overall—and his comprehension score advanced from a below average to an average level. The growth measured by Dr. Braniecki's evaluation—performed shortly after the IEP was developed—only serves to reinforce the conclusion that A.A. had, thus, made progress. Ignoring the superlatives assigned to his growth, there was clear evidence of progress introduced at the hearing which supported the IHO and SRO's conclusion in that regard. (C.R. 17-18; C.R. 206-07.) Nevertheless, despite A.A.'s progress, the question remains whether the services provided to A.A. were properly designed to address his needs.

IHO and SHO's specialized knowledge. Nevertheless, this Court's review of the record, providing appropriate deference to the thorough reasoning of the IHO and SRO, leads ultimately to a different conclusion. The Court agrees that A.A. progressed under the District's program and that the IEP offered for the 2012-2013 school year may have continued that progression; but, the Court must still consider whether his placement in the 15:1 special education classroom for the majority of his educational instruction was appropriate in light of his needs. The issue of whether his environment was sufficiently integrated with non-disabled peers is addressed during this Court's consideration of whether he was placed in the least restrictive environment.

*1. Whether the District's program of instruction was appropriately tailored to A.A.'s needs*

This Court, affording a proper degree of deference, adopts the conclusion made by the SRO that the District based the IEP for the 2012-2013 school year off of sufficient information that it had in its possession. (*See* C.R. 16 ("concur[ring] with the IHO's determination that the CSE assessed the student in all areas of need and had sufficient information available to develop an IEP").)[27] But the record reflects significant disagreement as to whether A.A. was receiving the "multi-sensory" program in a small class environment that his educators, evaluators, and parents believed he required to advance.

Ms. Graff's testimony during the hearing is most critical to this determination, as she was in the best position to assess his needs. She served as A.A.'s regular education teacher beginning

---

[27] The SRO also concluded that the IEP did not need to account for the competing dyslexia diagnosis at this time. (C.R. 15 n.5 (assuming "for the purposes of [its] decision . . . that [all evaluations] were timely provided to the district" since it would not impact the SRO's opinion regarding A.A.'s classification).) This Court finds that conclusion hard to reconcile with the testimony provided at the hearing. Indeed, if the CSE had access to the Braniecki evaluation, which the SRO specifically concluded it did not (C.R. 18), then the adequacy of the program provided in 2012-2013 would be in serious doubt, as discussed *infra* when considering the 2013-2014 program offering. Instead, the Court concludes the weight of the evidence supports the factual finding that the District did not have any of the competing diagnoses in their possession until the next annual review.

in the second grade, was familiar with him at the time he was evaluated for special education services, and maintained an independent tutoring relationship with him once he left Woodglen for Hawk Meadow. Ms. Graff testified at the hearing that during his second-grade year, before A.A. was referred for a special education evaluation, she provided him with specialized reading instruction using aspects of the "Wilson program" in her general education classroom. (C.R. 51; *see also* C.R. 116 (Graff).) Though she did not attend the CSE meeting held that year to evaluate A.A., she believed he needed a "multisensory" program to support his reading instruction. (C.R. 122.) She also testified that she had been unable to provide a full Wilson-based program during his second-grade year. (C.R. 121.) Dr. Braniecki also "recommended instruction through a multisensory approach" coupled with "1:1 assistance [for A.A.] with his learning and attention issues," concluding that "if his current placement was unable to meet those needs, [then] he may require an alternative placement." (C.R. 133, 143-44.)

In considering whether the IEP "provide[d] for the use of appropriate special education services," the IHO noted that Dr. Braniecki's post-CSE evaluation confirmed "special class placements for ELA and math would be appropriate *as long as* they addressed his needs in reading and math and gave him special education support in writing." (C.R. 202-03 (emphasis added).) Notably however, the concept of a multisensory approach—which the IHO referenced extensively in determining the inappropriateness of Hawk Meadow as an alternative placement and which Dr. Braniecki endorsed—is not mentioned during the IHO's evaluation of the adequacy of the 2012-2013 IEP. Nor did the IHO mention Ms. Graff's opinion regarding the inadequacy of the services provided. Instead, in a later conclusion, the IHO relied on the services A.A. received across his multiple years at Woodglen, finding that "[t]he evidence show[ed] that in prior academic years, [A.A.] was instructed . . . using the Wilson scientifically-

based, sequential multisensory methodology . . . and [that] there [was] no evidence that the District would not have continued to instruct him using scientifically-based, sequential multisensory methodologies for the 2012[-2013] school year, in line with Dr. Braniecki's recommendations."  (C.R. 225.)

The SRO, finding the IHO had considered the Braniecki evaluation in error, nevertheless determined that "the May 2012 CSE [could not] be faulted for failing to follow the recommendations contained in the [unavailable] report, such as the recommendation for a 'multisensory approach to learning and 1:1 assistance.'"  (C.R. 18 (citing C.R. 5114 (D-45) at 5124.)  Because the SRO concluded that "the focus of the inquiry is on the information that was available to the May 2012 CSE at the time the May 2012 IEP was formulated," it discounted Braniecki's recommendation for a multisensory approach, finding "the IHO's reasoning regarding the appropriateness of the recommended program's ability to address [A.A.'s] needs [was] otherwise sound [and] supported by the hearing record."  (*See* C.R. 18; *see also* C.R. 254 (Plaintiff's similar arguments below on this subject).)

A review of the IEP for that year notes a one hour and thirty minute ELA block in the special education class to be provided daily, on a 15:1 basis, with no mention of the type of program that would be implemented.  (*See* C.R. 5059 (D-24).)  As Plaintiff argued below: "Not one evaluation, report, letter, email, report card, progress report, or IEP (comments section as well, academic section, goals and objectives) contains any reference to [the use of] a Wilson program with A.A., to data pertaining to Wilson, or to progress A.A. made using Wilson." (C.R. 251.)  Although a "district 'may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used'" to support the validity of an IEP, *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 462 (2d Cir. 2014), the record evidence does support the

idea that some sort of Wilson-based program was generally used with A.A.—and the extended ELA time block would have allowed for that program to be used during the 2012-2013 school year.[28] *See E.W.K. ex rel. B.K. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 884 F. Supp. 2d 39, 52-54 (S.D.N.Y. 2012) (IEP found to be adequate where plaintiffs argued student in question needed a "multi-sensory approach such as Orton Gillingham" but evidence adduced at hearing demonstrated CSE balanced student's needs and provided "two 40–minute sessions of reading instruction services per week at a 5:1 ratio") (collecting cases); *see also Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 427 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) (IEP for a dyslexic student was adequate, where student was "offered specially designed reading instruction in a small group setting, using the Wilson Methodology," though notably only in 30 minute blocks, "testing accommodations and classroom modifications appropriate for his dyslexia, ADHD and lack of organizational skills").

The 15:1 class setting, however, is antithetical to the Wilson approach. Ms. Graff noted that one-on-one, direct instruction was necessary to make sure the method was being adequately received. (C.R. 2585 (Graff) ("If you spell something wrong, you can't practice it that way.").) Dr. Braniecki's recommendation for 1:1 assistance, introduced at the hearing, bolsters Ms. Graff's testimony and opinion that the 15:1 special education classroom *alone* was inadequate to address A.A.'s reading issues. *Cf. Matrejek*, 471 F. Supp. 2d at 427 (inclusion of small group instruction was one factor demonstrating adequacy of IEP); *E.W.K.*, 884 F. Supp. 2d at 52-54 (same); (C.R. 2585-86 (Graff) ("you need to have somebody who is there checking what you're doing, delivering that type of lesson, following through with the Orton approach.")). Prior to his

---

[28] Ms. Graff specifically opined at the hearing that the time spent instructing A.A. would not have been appropriate for his needs (C.R. 2585-87), but it is unclear whether she was referring to the reduced ELA block present in his 2013-2014 IEP or the longer period offered in his 2012-2013 IEP.

inclusion in the special education classroom, A.A in fact received his Wilson instruction in a more appropriate 2:1 pull-out environment with Ms. Mahoney. (C.R. 1049-50 ("It was a full Wilson model, with one other student, so it was just the three of us.").) But the 15:1 ratio of the special education classroom would not have permitted the level of direct interaction the witnesses testified was required under Wilson. (C.R. 1060-61 (noting there were 15 students in the ELA special education class during A.A.'s second grade year).)

Thus, despite the fact that A.A. appears to have progressed, he was nevertheless placed in a program that was not tailored to his needs with a group of students too large to successfully administer that program.[29]

### 2. Whether the District's program of instruction was offered in the least restrictive environment

The IDEA states a clear preference for mainstreaming students with disabilities: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are [to be] educated with children who are not disabled[.]" 20 U.S.C. § 1412(a)(5)(A). Thus, "the presumption in favor of mainstreaming [is] weighed against the importance of providing an appropriate education to [] students" with disabilities, *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008) (citation omitted), in cases where "education in regular classes . . . cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A) ("only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved

---

[29] The IHO also focused on A.A.'s math instruction without recognition that his educators did not feel math was a particular area of concern at the time that his IEP was formulated. (*See* C.R. 1143 (Mahoney).) In fact, the school psychologist noted that reading comprehension was the most critical area because it impacted all other subjects. (C.R. 883-84 (Grant) ("[r]eading [c]omprehension [] is the single most important [skill] a child needs to progress in an educational setting").)

satisfactorily" is it appropriate to use "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment").

The decision by the IHO, affirmed by the SRO, that A.A. was placed in the least restrictive environment is also against the weight of the testimony. "The school must aim to minimize the restrictiveness of the student's environment while also considering the educational benefits available in that environment, 'seek[ing] an optimal result across the two requirements.'" *T.M.*, 752 F.3d at 162 (quoting *M.W.*, 725 F.3d at 145). To be sure, the District witnesses uniformly indicated that more supports were needed for A.A. beyond the pull-out sessions, or the RTI supports, put in place during his second grade year. But "[u]nder the IDEA, a disabled student's least restrictive environment refers to the least restrictive educational setting consistent with *that student's needs*, not the least restrictive setting that the school district *chooses to make available*." *Id.* at 163 (emphasis added).

The IHO cursorily addressed the CSE's mainstreaming of A.A., noting that the CSE, Ms. Graff, and Ms. Mahoney agreed he should receive as much mainstreaming as possible and then finding "that the CSE's recommendation for mainstreaming in the 2012[-2013] school year was appropriate." (C.R. 206 (noting he received "mainstreaming in all subject areas other than ELA and math").) The SRO adopted this conclusion, finding the special education classroom appropriate "due to the student's need for special instruction in a smaller classroom environment." (C.R. 18.)[30] Neither determination reflects the measured weight of the evidence.

---

[30] The SRO also rejected Plaintiff's arguments below that A.A. was kept in the special education classroom for the majority of his day in contravention of the IEP, finding "the hearing record d[id] not support a finding that there was a material deviation from [his] IEPs." (C.R. 19.) Although Ms. Graff testified that after the RTI meeting, A.A. spent only 37 minutes per day in her classroom—meaning he spent the vast majority of his time in the special education classroom (C.R. 123 (Graff); *see* C.R. 2604)—there were other slots in the day, including gym, lunch, recess, and music, where he was present with the mainstream students. (*See* C.R. 3850-51 (Avaras).) The Court agrees with the SRO in this regard; the question remains, however, whether it was appropriate for A.A. to receive the majority of his educational instruction in the special education classroom.

Ms. Graff specifically testified that A.A. had no behavioral issues (C.R. 2394-95 ("He was not a behavior problem, ever."), 2418) and that it "was a detriment for him" to be pulled out of the mainstream. (C.R. 2469 ("he really, socially, could have thrived in the mainstream").) She felt that A.A. needed to socialize with children at his level and that the recommended program was not appropriate. (C.R. 124.) But, she never voiced these concerns because, in her view, there were no other choices available. (C.R. 124; *see also* C.R. 3782 (Avaras) ("there were no alternatives on the table").) Indeed, A.A. voiced his own disappointment at the placement to his parents repeatedly. (C.R. 3852 (Avaras) ("he hated school" after his placement), 5052 (D-24) (IEP minutes note A.A.'s parents brought his "unhappiness in school" to the CSE's attention).)

"In order to comply with the LRE requirement, . . . a school district must consider an appropriate continuum of alternative placements, and then must offer the student the least restrictive placement from that continuum that is appropriate for the student's disabilities." *T.M.*, 752 F.3d at 163. A.A. was placed in a self-contained classroom with no non-disabled students (C.R. 204-205; *see also* 582 (Grant) (describing makeup of class))—and without the beneficial social interactions he was accustomed to prior to his shift from the general education classroom to the special education setting. Moreover, the IEP (C.R. 5052 (D-24)) provides no indication that the CSE considered the creation of small *integrated* classrooms, with disabled and non-disabled students, in order to accommodate the various reading issues encountered by Woodglen's students and A.A. in particular. *See, e.g.*, *M.F. v. Irvington Union Free Sch. Dist.*, 719 F. Supp. 2d 302, 309 (S.D.N.Y. 2010) (student's "educational program for the [upcoming] school year was changed from a self-contained setting to consultant teacher services because it appeared to the school psychologist . . . that [his] 'availability to learning was actually greater in the larger classroom setting'" and his "decoding problems were adequately addressed by the

CSE's recommendation to enroll [him] in a daily developmental reading class with . . . a certified reading specialist").

Because the District did not consider an appropriate continuum of alternative placements when it decided to place A.A. in the self-contained classroom, he was not placed in the least restrictive environment necessary to address his disabilities.  *See T.M.*, 752 F.3d at 162 (program offerings found inadequate where "self-contained special education classrooms with no nondisabled students" placed the student "in a more restrictive educational setting for his [educational] program than his disability required"); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 575 (S.D.N.Y. 2010), *aff'd*, 486 F. App'x 954 (2d Cir. 2012) (no evidence that "the CSE considered accommodating [the student's] need for a small class by placing her in a small, integrated classroom").  The District cannot skirt its obligations under the IDEA by only providing two choices—education is neither a one-size fits all proposition nor is it simply binary.

*   *   *

Therefore, a preponderance of the evidence does not support the IHO and SRO's determination that the 2012-2013 IEP would have provided A.A. with a free and appropriate public education in the least restrictive environment.

> ii.  *Whether A.A. Was Offered a Free and Appropriate Public Education in the Least Restrictive Environment During the 2013-2014 School Year*

The Court agrees with the SRO and IHO, though for additional reasons, that the District did not provide A.A. with an appropriate educational opportunity for the 2013-2014 school year. The SRO adopted "the IHO's determination that the June 2013 CSE lacked sufficient evaluative data to make a recommendation for the 2013-[2014] school year[.]"  (C.R. 19.)  Specifically, the IHO concluded that "the District had no access to educational records from Hawk Meadow or

40

Arlington upon which to . . . base its recommendations for the 2013[-2014] school year."
(C.R. 212-23 ("the District had insufficient evaluations and information about the Student at the time it met to recommend a program for the Student on June 19, 2013, and as such, the IEP does not reflect the results of recent evaluations and educational information to identify the Student's needs, rendering the IEP inappropriate").)[31]  This Court concurs with that conclusion.

"A local educational agency's duty to provide a FAPE is not ended by enrollment of a resident child in a private school outside the district."  *Doe*, 790 F.3d at 450.  Therefore, despite his placement at Hawk Meadow, A.A. was entitled to an IEP designed by the District and "reasonably calculated to enable [him] to make progress appropriate [to his] circumstances." *Endrew F.*, 137 S. Ct. at 1001.  The District's recommendations for A.A.'s IEP for 2013-2014 were largely the same as the prior year's IEP and were not based on reports of his progress at Hawk Meadow.  (C.R. 70-71; C.R. 5095-5105 (D-41) (adding 45 minutes per day of a five student resource room).)  An IEP based on stale information, without the benefit of *any* recent educational progress metrics or evaluations, cannot be reasonably calculated to ensure appropriate progress.  *See, e.g.*, *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 556 (S.D.N.Y. 2016) ("By using goals that were designed to expire by the time the IEP was to implement them (for a full year thereafter), the DOE has not shown that the IEP was likely to produce progress."); *see also Engwiller v. Pine Plains Cent. Sch. Dist.*, 110 F. Supp. 2d 236, 240 (S.D.N.Y. 2000) (noting that the IDEA requires the IEP to be "reviewed and revised each school year" (citing 20 U.S.C. § 1414(d))); *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1058 (9th Cir.

---

[31]  The IHO recognized "the District's position that the Parents interfered" with its ability to accumulate new evaluative data, but concluded those were issues for the third prong of the *Burlington-Carter* test—balancing of the equities.  (C.R. 213); *see also Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055–56 (9th Cir. 2012) ("participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents").

2012) (continued reliance on an outdated, year-old IEP is "not reasonably calculated to ensure educational benefits" are provided to student); *cf. M.H.*, 685 F.3d at 256 (reliance on goals from a year prior, without evidence they had become inappropriate, did not result in a deficient IEP).

Moreover, in this case, the District not only relied on stale information but it apparently disregarded the only new information it did possess. The record shows that the District became aware of Dr. Braniecki's evaluation of A.A. "around the time of" the June 19, 2013 CSE meeting where the 2013-2014 IEP was designed. (C.R. 94.) This means that the District never updated the IEP to include any form of "disability" despite Braniecki's conclusion that A.A. had ADHD *and a learning disability in written expression.* (C.R. 129-30, 132, 133-34 ("her findings were consistent with a diagnosis of ADHD and a learning disability," but "she could not diagnose him with a reading disability").)[32] Although Braniecki did not think a classification of learning disabled should *replace* the classification of OHI, she testified that both classifications were accurate and the disabilities "impact each other." (C.R. 142 (Braniecki); C.R. 4865 (P-W) ("given his learning difficulties, it is strongly recommended that his classification include learning disability to be able to better accommodate his multiple needs").)

Given the record, the Court cannot adopt the SRO's conclusion that "even if the other health-impairment classification were not the most appropriate, it did not compromise the student's right to an appropriate education." (C.R. 15.) In this instance, failing to revise the IEP to include this new information—which directly related to A.A.'s educator's primary concern (his ability to comprehend information)—rendered the IEP deficient.

---

[32] "The IDEA [also] requires school districts to reevaluate students with disabilities at least once every three years to ensure that educational programs are well-suited to the student's evolving needs." *V.M.*, 954 F. Supp. 2d at 117–18 (citations omitted).

*iii. Whether Plaintiff's Unilateral Placement of A.A. at Hawk Meadow During the 2012-2013 and 2013-2014 School Years was Appropriate*

The District Defendants focus on their contention that Hawk Meadow was not an appropriate alternative, despite the IHO and SRO concluding, albeit for more limited reasons than this Court, that the IEP for 2013-2014 was deficient. It bears noting at the outset that the IHO and SRO did not determine the appropriateness of Hawk Meadow for the 2012-2013 school year because it found A.A. received a free and appropriate public education for that year. Nevertheless, the opportunities available at Hawk Meadow were fully discussed by the IHO and considered by the SRO. Thus, the Court can decide the appropriateness for both years based on the information presented at the hearing.

"Unilateral withdrawal [] will in most cases be the parents' most attractive option when faced with an IEP to which they object[.]" *E.M.*, 758 F.3d at 452. A private placement is appropriate if it is "reasonably calculated to enable the child to receive educational benefits," *C.F.*, 746 F.3d at 82 (quotation marks omitted), "such that the placement is likely to produce progress, not regression," *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014) (quotation marks omitted). "In determining whether a placement reasonably serves the educational needs of a child with a disability and is likely to produce progress," a reviewing court may consider the "totality of the evidence, including 'grades, test scores, regular advancement, or other objective evidence.'" *T.K.*, 810 F.3d at 877; *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 770-71 (6th Cir. 2001) (unilateral private placement appropriate where, *inter alia*, class sizes were small, the student made significant educational progress, and his grades and behavior improved significantly). But "[n]o one factor is necessarily dispositive[.]" *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006).

The test for the private placement "is that it is appropriate, and not that it is perfect." *C.L.*, 744 F.3d at 837 (quotation marks omitted).  In fact, parents bear a lower burden with regard to demonstrating the appropriateness of a private placement than school districts do when demonstrating the adequacy of the educational opportunity provided because "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free and appropriate public education."  *Frank G.*, 459 F.3d at 364.  "To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential," *id.* at 365, though it must, "at a minimum, provide some element of special education services in which the public school placement was deficient."  *Id.* (citing *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003)).

The District and the CSE made no formal finding regarding the comparability of the District's offering for A.A. and the program offered by Hawk Meadow.  (C.R. 68, 90 (Fucci), 115 (Carlson).)  At the hearing, Mr. Fucci testified on behalf of the District that he was concerned with the small number of students in the school and the school's and staffs' lack of state certification.  (C.R. 91 (Fucci); *see also* C.R. 147-48, 166 (Castle) (confirming Hawk Meadow was not approved by New York State to provide either middle school level or special education services, though it was registered with the Montessori Society to provide education through the middle school level).)  But "[a]n appropriate private placement need not meet state education standards or requirements" or "provide certified special education teachers or an IEP for the disabled student."  *Doe*, 790 F.3d at 451 (quoting *Frank G.*, 459 F.3d at 364).  Indeed, Dr. Braniecki testified that a Montessori education might be appropriate, even without special

education programming, because the typical strategies used in a Montessori education have been found to be helpful for children with disabilities. (C.R. 139.)

Hawk Meadow provided A.A. with a number of benefits that were lacking from the IEPs created for him by the District, including small class sizes, integrated student environments, and a multisensory approach to learning.[33] While it is still an open question as to whether small class sizes—"the kind of educational and environmental advantage[] . . . that might be preferred by parents of any child, disabled or not," *Doe*, 790 F.3d at 452 (quoting *Gagliardo*, 489 F.3d at 115)—on their own are sufficient to make an alternative placement more appropriate than a school district's offering, A.A. received other benefits rendering Hawk Meadow appropriate. *Compare Frank G.*, 459 F.3d at 365-66 ("We need not decide that small class size alone rendered the [alternative] placement appropriate because [the student's] teacher at [the school] adapted her instruction to meet his needs"), *with Doe*, 790 F.3d at 452, *cert. denied*, 136 S. Ct. 2022 (2016), *reh'g denied*, 136 S. Ct. 2546 (2016) (alternative placement "school did not offer any special education services and did not modify its curriculum to fit the Student").

Specifically, during his fifth grade year at Hawk Meadow, A.A. was in an upper elementary group with a total of five students. (C.R. 149.) Throughout this year, Ms. Graff also acted as a tutor for A.A. in connection with an additional teaching certification program she was completing, (C.R. 125 (Graff)), and she testified that Hawk Meadow was using a "multisensory" approach based on the "Orton-Gillingham" model in teaching its students. (C.R. 126.) Ms. Castle clarified during her testimony that the school followed the "Sequential English Education" (SEE) approach, which was "specifically designed to help students with reading and writing

---

[33] Both Ms. Graff and Dr. Braniecki testified to the importance of a multisensory approach and the benefits of a smaller class size—emphasizing the need for one-on-one instruction when it came to reading support.

difficulties." (C.R. 152.)[34]  And, during his sixth grade year at Hawk Meadow, A.A. was in an

upper elementary group with a total of nine students—where half of the other students had

special education classifications and the other half did not.  (C.R. 149, 169; *see* C.R. 5261 (D-

91), 4962-63 (P-III) (describing the class profile)); *see, e.g.*, *S.C. v. Katonah-Lewisboro Cent.*

*Sch. Dist.*, 175 F. Supp. 3d 237, 267 (S.D.N.Y. 2016), *aff'd*, --- F. App'x ----, No. 16-1838, 2017

WL 1906729 (2d Cir. May 9, 2017)  ("Although Plaintiffs are not held to the same

mainstreaming requirements as school districts, it bears noting that one consideration for

determining whether a program is the least restrictive environment is 'whether the school has

included the child in school programs with nondisabled children to the maximum extent

appropriate'") (citations omitted).

Ms. Castle, the co-founder—along with Plaintiff's sister—of Hawk Meadow, described

the Montessori education program as a "scaffolded sequential educational curriculum," and

explained that the instruction is essentially entirely differentiated: "each child is working at his or

her own pace." (C.R. 144-45 (Castle), C.R. 149.)  She explained that all Montessori materials

incorporate visual, auditory, and kinesthetic properties—*i.e.*, are multisensory.  (C.R. 156.)  She

also testified that the recommendations Dr. Braniecki had made as part of her evaluation were

implemented in the course of instruction that A.A. received.  (C.R. 160.)

In terms of qualitative measures of A.A.'s emotional and social progress, Ms. Graff saw a

difference in A.A.'s view of school: he was excited to share what he was doing at Hawk

Meadow.  (C.R. 126; *see also* C.R. 256 (Plaintiff's arguments below).)  At this time, he also

confided in her about some of the bullying he experienced at Woodglen.  (C.R. 126.)  Overall,

---

[34]  As an additional support, A.A. also had access to an "independent workstation," which allowed him to have a space to focus and work, designed to aid with his organizational issues.  (*See* C.R. 156 (describing the time he spent and in what form at his desk).)

she observed A.A. make slow upward progress despite continuing to struggle. (C.R. 126.) Plaintiff testified that it was not until A.A.'s sixth grade year that she witnessed social, emotional, and academic growth from his placement at Hawk Meadow. (C.R. 163 (she indicated the first year was difficult for him).)

Ms. Castle, after reviewing A.A.'s November 2013 progress report, testified that it showed some regression but also improved confidence. (C.R. 170; C.R. 4788 (P-B) (progress report).) When she was asked to compare the report from the end of the previous year (C.R. 4805 (P-J)) with the November 2013 report, she noted some progress, but a number of areas where his progress decreased. (C.R. 171.) Ms. Castle testified that although A.A. was a fifth grader when he entered Hawk Meadow, he was only reading at a second or third grade level; yet, at the time of the hearing, A.A. had advanced to a fifth grade level and was interpreting passages. (C.R. 157.)

As for quantitative measures of progress, the CSE did not have access to Ms. Avecilla's re-evaluation of A.A. conducted on June 20, 2013. At the hearing, however, Ms. Grant compared Ms. Avecilla's evaluation to Dr. Braniecki's report and opined that A.A. had generally declined—which was to be expected given his drastic decline in reading comprehension (68th percentile to 37th percentile). (C.R. 85; *see also* C.R. 111-12 (Avecilla) (testifying regarding general decrease in standardized testing scores during re-evaluation, but noting A.A.'s word reading had increased from the 32nd to 50th percentile).) Notably, however, Dr. Braniecki opined at the hearing that the decline "may or may not" be a result of A.A.'s attendance at Hawk Meadow. (C.R. 140.)

The IHO concluded that A.A. was not making progress under the program offered by the Montessori school. (C.R. 224 ("[A.A.] regressed in his Hawk Meadow placement as evidenced

by his Upper Elementary Progress Reports and in the results of standardized testing").)  The

SRO acknowledged that "not all of the factors considered by the IHO [were] relevant to the

appropriateness of the parents' unilateral placement (*e.g.*, the school's accreditation and teacher

certifications)," but concluded nonetheless that the "totality of the circumstances" demonstrated

that Hawk Meadow "failed to address [A.A.'s] special education needs." (C.R. 20.)  Specifically,

the SRO noted agreement with "the IHO's finding that [A.A.] received limited special education

instruction as part of his school day."  (*Id.*)  The SRO determined, in accordance with the IHO,

that "instead of receiving specialized instruction at Hawk Meadow, [A.A.] worked independently

at his desk for the majority of his school day."  (*Id.*)  Thus, the SRO did not address A.A.'s

progress at Hawk Meadow.

"[A]ssessment of educational progress is a type of judgment for which the district court

should defer to the [administrative hearing officer's] educational experience."  *Doe*, 790 F.3d

at 451 (quoting *Frank G.*, 459 F.3d at 367 (internal quotation marks omitted)).  However, in this

case, the IHO inappropriately relied, again, on information that was not in the possession of the

CSE at the time the IEP was created for the 2013-2014.  (C.R. 216 (discussing Ms. Avecilla's

July 2013 report and the finding that "mathematics proved to be the area of greatest need" for

A.A.).)  Therefore, the IHO's conclusion "that Hawk Meadow did not provide educational

instruction specifically designed to meet the unique academic needs of [A.A.] in the area of

*math*" assumes math, rather than literacy, was the main focus of A.A.'s educational struggles.

(C.R. 224.)  But, as discussed at length above, all of A.A.'s educators focused on his reading and

decoding issues.  Similarly, the IHO's conclusion that no services were provided to address

A.A.'s self-esteem and anxiety issues (C.R. 218) conflicts with the direct testimony of Plaintiff

and Ms. Graff, provided at the hearing, indicating that A.A. was excited about school and,

though he started out unsure of himself, grew more confident during his time in the Montessori setting.  (C.R. 126 (Graff); C.R. 4078-79 (Avaras).)

Thus, the largest impediment to finding Plaintiff's alternative placement appropriate is that A.A. did not progress by certain metrics.  (C.R. 221 (IHO's review of Ms. Avecilla's evaluation)); *cf. Frank G.*, 459 F.3d at 365 (the student's "social and academic progress, and his score on [a standardized test], support the appropriateness of the placement").  His lack of progress on standardized testing, however, is not dispositive as to the appropriateness of the placement.  *Cf. S.C.*, 175 F. Supp. 3d at 266 (affirming IHO's determination that "low standardized test scores" at the alternative placement "did not provide an accurate depiction of [the student's] academic progress").

Although the Court gives due consideration to the IHO and SRO's determinations, the weight of the evidence supports the conclusion that Hawk Meadow—which arguably did not provide the best education for A.A.—was a suitable alternative.  As the IHO noted, at Hawk Meadow "lessons were presented to students 1:1 [and] everyone in the group had 1:1 instruction at various times in the morning" (C.R. 216): a critical aspect of the educational program that was missing from the District's IEPs.  Moreover, the SRO's conclusion that A.A. received "limited special education instruction" ignores the fact that he was immersed in a multi-sensory program, specifically designed to address reading and writing issues, where each student worked at his or her own pace.  Finally, A.A. made progress, in a completely integrated small class environment, in two critical areas: self-esteem and reading.  Notably, his reading advanced both by non-standardized assessments (C.R. 157 (A.A.'s reading advanced to a fifth grade level, and he was interpreting passages)) and by certain aspects of the standardized testing discussed at the hearing. (C.R. 111-12 (Avecilla) (A.A.'s word reading had increased from the 32nd to 50th percentile).)

Therefore, the Court concludes that by a preponderance of the evidence presented at the hearing, Hawk Meadow was an appropriate alternative placement for A.A. in that it provided "element[s] of special education services in which the [District] was deficient." *Frank G.*, 459 F.3d at 365 (citation omitted).

### c. Whether the Equities Favor Reimbursement

Having determined that the District did not provide A.A. with an appropriate educational opportunity for his fifth (2012-2013) and sixth (2013-2014) grade years and that Hawk Meadow was an appropriate alternative placement designed to address his particular learning needs, the next necessary determination pursuant to the *Burlington/Carter* test is whether a balance of the equities favors reimbursement. *See Burlington*, 471 U.S. at 374. Generally speaking, however, courts only address this final factor when there are fully developed conclusions on the issue from the state agencies. *See, e.g.*, *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 166–67 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217, 254 (2d Cir. 2012) ("the SRO did not reach the issue, although the IHO . . . found 'that equitable considerations support tuition reimbursement'"); *D.M. v. City Sch. Dist. of the City of N.Y.*, No. 15 Civ. 1619 (LGS), 2016 WL 319859, at *8 (S.D.N.Y. Jan. 26, 2016) (SRO did not address third prong, but Court concurred with IHO "that the equities weigh in favor of reimbursement," particularly since Defendant was found to have conceded the issue); *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 660 (S.D.N.Y. 2005) (SRO did not reach the issue, but Court would "agree with the IHO that the parents are not equitably entitled to reimbursement"); *cf. D.N. ex rel. D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist.*, No. 14 Civ. 99 (GRB), 2015 WL 5822226, at *16 (E.D.N.Y. Sept. 28, 2015), *appeal withdrawn* (Nov. 30, 2015) ("While neither the IHO nor the SRO considered the third prong, [they] made sufficient findings of fact" to allow the Court to consider the issue).

Here, particularly in light of the IHO's categorization of certain issues as falling within the equities prong and corresponding reticence to address that prong as unnecessary (*see supra* note 31; C.R. 213, 235), the Court is unable to engage in an IDEA review without providing the IHO and SRO an opportunity to determine the balance of the equities in the first instance. *See, e.g.*, *T.C. v. New York City Department of Education*, No. 15 Civ. 2667 (KPF), 2016 WL 4449791, at *26 (S.D.N.Y. Aug. 24, 2016) (remanding to the SRO for determination on a "limited ground" where the record was unclear).

## II. Other Claims

Having addressed the vast majority of Plaintiff's claims in the preceding IDEA review, the Court now turns to her remaining claims. A review of the operative complaint indicates that she is also attempting to plead claims under the ADA, the RA, and § 1983. (Compl. at 2.)

### a. Inapplicability of the IDEA's Exhaustion Requirements

Contrary to Defendant's arguments that these claims are "barred" because they are unexhausted (Dist. Mem. at 2, 12-14), "even when the suit arises directly from a school's treatment of a child with a disability—and so could be said to relate in some way to [the child's] education"—if the hearing officer could not have offered Plaintiff the relief she sought on these claims, then exhaustion is inapplicable. *Fry*, 137 S. Ct. at 754.[35] In *Fry*, the Supreme Court addressed the exhaustion requirement in a similar scenario. There, the plaintiffs sought relief under the IDEA, ADA, and RA for an elementary school's refusal to allow their daughter's service dog, Wonder, to accompany her to school. *Id.* at 751. The harm suffered was emotional distress, pain, embarrassment, and mental anguish as a result of the alleged discrimination: the

---

[35] *Fry* was decided after the parties submitted their briefing on these issues.

decision to not allow the service animal to accompany the student. *Id.* at 752. The plaintiffs sought declaratory and monetary relief. *Id.*

The *Fry* court posed two hypothetical questions to assist in answering whether the gravamen of a complaint concerns the denial of an appropriate educational opportunity or some other form of discrimination protected by another statute. First, would the claim be viable against "a public facility that was *not* a school[?]" *Id.* at 756. And second, could an adult rather than a student make the same claim against the school? *Id.* Negative answers suggest the complaint revolves around the IDEA and that the exhaustion requirements apply, while affirmative answers mean the opposite—that the complaint is "unlikely to be truly about" the IDEA. *Id.*; *but see id.* at 759 (Alito, J., concurring) ("these clues work only in the absence of overlap"). "In short, the IDEA guarantees individually tailored educational services, while [the ADA] and [RA] promise non-discriminatory access to public institutions." *Id.* at 756.

Here, Plaintiff alleges A.A. was "warehoused" in a self-contained classroom and that she and A.A. were subjected to "due process administrative procedures that violated due process, [the] IDEA, and Section 504." (Compl. at 6.) As to the Department, she specifically alleges that it abdicated its oversight responsibilities and failed to ensure school districts were in compliance with applicable law. (Compl. at 10-11.) She also alleges "[c]ountless requests" for A.A.'s educational records were denied. (Compl. at 7.) In terms of relief, she seeks compensatory and punitive damages (for lost wages, private counseling "due to segregation discrimination," and attorneys' fees), and a full audit of the District. (Compl. at 4.) She alleges A.A. was denied a free and appropriate public education, as well as injuries unrelated to such a denial including psychological, emotional, and financial injury to herself and A.A. (Compl. at 3.)

It is beyond question that Plaintiff exhausted all facets of her IDEA claim that the Court addressed above. Therefore, to the extent Plaintiff's claims are completely duplicative of her IDEA claims, they have been addressed. The two categories of claims the Court must consider are a) claims that also *could have been* addressed via the IDEA and b) claims which seek relief separate and apart from that provided available under the IDEA. The portion of these claims that overlap with the IDEA—*i.e.*, those that complain of A.A.'s educational experience and seek tuition reimbursement or related monetary damages—and which were not raised with the IHO and SRO cannot be raised for the first time in this Court. (*See, e.g.*, Compl. at 7 (alleged "stay put" violation), 8 (alleged procedural violation based on the District's alleged failure to provide Plaintiff with a "listing of continuum of alternative placements").) Nevertheless, much of the relief she seeks is not available under the IDEA, such as lost wages and punitive damages. To the extent any of her non-IDEA claims are viable, addressed below, they are not subject to the IDEA's exhaustion requirement because "[a] hearing officer, [lacking the power to order any relief], would have [had] to send her away empty-handed." *Fry*, 137 S. Ct. at 754.

### b. The Department's Motion to Dismiss

To the extent that Plaintiff seeks monetary damages against the Department under the IDEA, whether for compensatory or punitive damages, such damage claims cannot be brought under the IDEA and must be dismissed. *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 486 (2d Cir. 2002). The proper relief, if applicable, will be the reimbursement of Plaintiff's tuition and related expenses for A.A.'s placement at Hawk Meadow. Moreover, as discussed above, the Department is not a proper or necessary party to Plaintiff's IDEA claims. Absent specific allegations of violations of federal and state law by the Department that may have led to procedural deficiencies at the district, IHO or SRO levels—

allegations which are not present here—such an action cannot be brought against the Department.  *See, e.g.*, *Yamen by Yamen v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 909 F. Supp. 207, 211 (S.D.N.Y. 1996) ("complaint contain[ed] no allegation of any action or practice on the part of the State defendants . . . that may have led to the alleged procedural deficiencies at the district level, the impartial hearing or before the State Review Officer").  Plaintiff's conclusory allegations about what her "tapes will reveal" regarding allegedly inappropriate *ex parte* communications and perjury provide no details from which the Court can surmise a plausible allegation of wrongdoing.  (*See* Compl. at 11.)[36]

Furthermore, any claim asserted against the Department as a state agency under New York Education Law related to bias by the IHO or SRO, or pursuant to Section 1983, is barred by the Eleventh Amendment, or sovereign immunity—particularly since Plaintiff does not seek cognizable injunctive relief.  *See, e.g.*, *A.A. v. Bd. of Educ., Cent. Islip Union Free Sch. Dist.*, 196 F. Supp. 2d 259, 263-66 (E.D.N.Y. 2002), *aff'd sub nom*, *A.A. ex rel. J.A. v. Philips*, 386 F.3d 455, 457 (2d Cir. 2004) (noting the district court had "dismissed all monetary claims against SED for alleged past violations of federal law, whether such relief was sought under the IDEA, Section 504, or through § 1983; and dismissed plaintiffs' separate claim under the New York State Education Law on the ground that the claim was barred by the Eleventh Amendment"); *see also Bd. of Educ. of the Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 479-80 (2d Cir. 2002) (affirming dismissal of § 1983 claims against the Department on Eleventh Amendment grounds).

Assuming that the process set out in the IDEA creates a due process right traditionally enforceable under § 1983, the Second Circuit has repeatedly held that a § 1983 due process claim

---

[36]  The Court does not agree with the Department's mootness argument (that any potential procedural infirmities will be addressed and decided by this Court rendering the Department's involvement in the litigation unnecessary), given the potential for remand to the IHO and/or SRO in IDEA actions.  (*See* Dep't Mem. at 13-14.)

is not available where there was an adequate state post-deprivation procedure to remedy an alleged deprivation of due process—such as the IHO and SRO process. *See Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 881 (2d Cir. 1996) ("there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state post-deprivation procedure to remedy a random, arbitrary deprivation of" a protected interest).

Therefore, the only potential claims that may be asserted against the Department are claims under the ADA and RA, which are addressed below.

### c. Claims under the ADA, RA, and § 1983 against the District and the Department

#### i. The ADA and RA

Plaintiff's claims allegedly brought pursuant to the ADA and RA are largely duplicative of her IDEA claims—and seek the same relief. However, to the extent that some of the claims are distinguishable either because they seek relief unavailable under the IDEA or because they address specific acts of discrimination beyond simply the denial of a free and appropriate public education, the Court considers whether any of the claims are plausibly alleged.

A plaintiff seeking to establish a prima facie case of discrimination under either the ADA or the RA must allege facts sufficient to establish that: "(1) plaintiff is a 'qualified individual with a disability;' (2) plaintiff was 'excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity;' and (3) such exclusion or discrimination was due to [plaintiff's] disability.'" *B.C. v. Mount Vernon School District*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)); *see Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15 Civ. 5432 (NSR), 2016 WL 6901314, at *9 (S.D.N.Y. Nov. 18, 2016) ("the same legal standards govern the disability provisions of the ADA [and] RA").

The first consideration, however, is not automatically established by a student receiving special education services under the IDEA. "[T]he ADA and IDEA set forth distinct legal standards in their definitions of 'disability,' such that an individual will not qualify for the ADA's protections simply by virtue of his or her disabled status under the IDEA." *B.C.*, 837 F.3d at 160. "[A] child might 'need[ ] special education and related services' by reason of an impairment," as required by the IDEA, "even if that impairment does not 'substantially limit[] . . . [a] major life activit[y],'" the definition of a disability under the ADA. *Id.* at 159 (*comparing* 20 U.S.C. § 1401(3)(A), *with* 42 U.S.C. § 12102(1)(A)). "A plaintiff seeking redress under the ADA must 'show that any limitations are in fact substantial, not amounting to only a mere difference in conditions, manner, or duration.'" *Id.* at 160. Thus, "[t]hose seeking relief pursuant to ADA or Section 504 must come forward with 'additional evidence'—beyond simply their eligibility for IDEA coverage—showing their eligibility for the remedies afforded by the ADA and Section 504." *Id.* at 161. Here, Plaintiff has offered no allegations separate from those supporting his IDEA claims that would allow the Court to infer that A.A. is limited in a major life function such that he would qualify as disabled under either statute.

Furthermore, even assuming *arguendo* that A.A. is disabled in such a sense and was excluded from the District's programs, the third requirement for a prima facie showing of disability discrimination requires that the exclusion was a result of his disability. "Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Id.* at 158. Where, as here, the gravamen of the complaint is the denial of a free and appropriate public education, "there must be [at least allegations] that a school district acted with deliberate or reckless indifference to the student's federally protected rights or with 'bad faith or gross misjudgment.'" *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700

F. Supp. 2d 529, 564 (S.D.N.Y. 2010); *see also Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.*, 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007) ("Where a plaintiff asserts denial of a free appropriate public education . . . , plaintiff must demonstrate bad faith or gross misjudgment."); *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005) (noting that a Rehabilitation Act claim may be brought if "a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE"). Here, Plaintiff's IDEA claims do not plausibly allege the necessary degree of bad faith, gross misjudgment, or deliberate or reckless indifference required for disability discrimination claims under the ADA and RA.

The same holds true with respect to the Department. None of Plaintiff's allegations demonstrate that the Department took action against A.A. or Plaintiff in bad faith or as a result of gross misjudgment or negligence. Plaintiff's allegations, including that A.A. was "warehoused" in a self-contained classroom, that she and A.A. were subjected to "due process administrative procedures that violated due process, [the] IDEA, and Section 504" (Compl. at 6), that the Department abdicated its oversight responsibilities and failed to ensure school districts were in compliance with applicable law (*id.* at 10-11), and that "[c]ountless requests" for A.A.'s educational records were denied (*id.* at 7), are either contrary to the record established with respect to her IDEA claims or do not plausibly allege disability discrimination *as a result of deliberate or reckless indifference to A.A.'s disability.*

Therefore, Plaintiff's claims against the District and the Department must be dismissed for failing to adequately allege that A.A. was "excluded from any programs, denied benefits, or otherwise discriminated against *on the basis of his disability.*" *A.G. on behalf of J.G. v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, No. 16 Civ. 1530 (VB), 2017 WL 1200906, at *12 (S.D.N.Y. Mar. 29, 2017) (citation omitted). A.A. was provided educational benefits, as detailed above—

Plaintiff is simply contesting whether the benefits provided were appropriate. *See Streck v Bd. of Educ. of the E. Greenbush Sch. Dist.*, 280 F. App'x 66, 68 (2d Cir. 2008) (dismissing ADA and RA claims where student was "afforded 'access to an existing program'" but the "content and sufficiency of the IEP" were challenged).

### ii. Section 1983

To the extent that Plaintiff is seeking to eventually introduce unrevealed tape recordings of conversations between the IHO and others (Compl. at 11) to demonstrate "infirmaries in the due process system," she did not raise such a claim in her petition for SRO review. Moreover, as noted above with regard to the Department, she also provides no details from which the Court could infer that the District engaged in any actionable misconduct. Instead, having availed herself of the administrative review process, Plaintiff is not entitled to pursue a damage claim pursuant to § 1983 without plausibly alleging she was denied the procedural safeguards to which she was entitled under the IDEA. *See Streck*, 280 F. App'x at 68 ("plaintiffs may not rely on § 1983 to pursue monetary damages for violations of the IDEA" where "they were afforded a hearing before an impartial hearing officer and review by a state review office").

## CONCLUSION

For the foregoing reasons, the District Defendants' motion for summary judgment is GRANTED in part and DENIED in part, and the Department's motion to dismiss is GRANTED. All of Plaintiff's non-IDEA claims are dismissed. As for Plaintiff's IDEA claims, the Court finds that 1) Plaintiff's pre-2012-2013 claims are time-barred, 2) A.A. was denied a free and appropriate public education for the 2012-2013 and 2013-2014 school years, and 3) Hawk Meadow was an appropriate alternative for A.A. in light of his unique educational needs.

Because there is an insufficient record for this Court's review on the final prong of the *Burlington/Carter* test, and all of Plaintiff's other claims have been dismissed, this matter is

REMANDED to the IHO to consider the narrow issue of whether the equities favor reimbursing Plaintiff for the costs associated with A.A.'s private placement at Hawk Meadow for the school years (2012-2013 and 2013-2014) when he was denied a free and appropriate public education by the District. *See E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 463 (2d Cir. 2014) (often it is more useful for a district court to "remand the matter to state administrative officers for a [] reexamination in light of" the court's decision). Should either party wish to appeal any eventual determination by the IHO, or SRO, on the equities of reimbursement, they should file a new complaint on that limited issue indicating the case is related to this prior litigation.

The Clerk of the Court is respectfully requested to terminate the pending motions at ECF Nos. 38 & 62 and to close the case.

Dated:　July 17, 2017　　　　　　　　　　　SO ORDERED:
　　　　White Plains, New York

_____

NELSON S. ROMÁN
United States District Judge